# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| ANGELINA EMERGENCY MEDICINE ASSOCIATES, P.A., et al., | |
| Plaintiffs, | Civil Action No. 3:18-cv-00425-X |
| v. | |
| HEALTH CARE SERVICE CORPORATION, et al., | Judge Brantley Starr |
| Defendants. | |

**<u>PLAINTIFFS' BRIEF IN SUPPORT OF OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO ALL THE BELLWETHER CLAIMS</u>**

**TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF OPPOSITION..............................................................1

FACTUAL BACKGROUND...................................................................................................4
    A.    Plaintiffs Provide Emergency Care to Defendants' Members................................4
    B.    Plaintiffs Possess Assignment of Benefits and Have Standing to Bring Suit..........5
    C.    Plaintiffs Exhausted Their Administrative Remedies...............................................6
    D.    The Byzantine Nature of the BlueCard System Leaves Plaintiffs in the
           Dark as to How Their Claims Are Adjudicated, Who Is Adjudicating the
           Claims, and the Standards that Are Applied when the Claims Are
           Adjudicated ...........................................................................................................7

SUMMARY JUDGMENT STANDARD....................................................................................7

LEGAL BACKGROUND – THE AFFORDABLE CARE ACT'S GREATEST OF
THREE..............................................................................................................................8

ARGUMENT ......................................................................................................................10

I.      Judicial Review Is Not Limited to the Administrative Record........................................10
    A.    This Is Not a Classic Benefits Determination ERISA Suit, and the
           Administrative Record Limitation Does Not Apply ...............................................11
    B.    Plaintiffs' Claims Meet Exceptions to the Administrative Record
           Limitation............................................................................................................14
    C.    Even If the Administrative Record Limitation Applies, this Court May
           Consider the Challenged Evidence Because Defendants Could Have
           Considered It In the Claims Adjudication Process .................................................17
    D.    The Plan Administrators Acted in an Arbitrary and Capricious Manner .............18

II.    Plaintiffs Have Standing to Bring Suit Under Their Patients' Health Benefit Plans
      and Insurance Policies................................................................................................18
    A.    Plaintiffs Have Sufficiently Demonstrated the Existence of Assignments
           of Benefits for All Bellwether Claims ..................................................................19
    B.    Plaintiffs Are the Named or Intended Assignees for the Bellwether Claims ........21
    C.    The Assignments of Benefits for Most Bellwether Claims Do Not Bar
           Plaintiffs from Asserting Causes of Action for Payment.......................................24
    D.    Defendants Waived Their Ability to Rely on Any Anti-Assignment
           Provisions.............................................................................................................26

III.   Plaintiffs Exhausted Their Administrative Remedies......................................................30
    A.    Plaintiffs Exhausted Their Administrative Remedies with Respect to the
           ERISA Bellwether Claims ...................................................................................33
    B.    Plaintiffs Exhausted Their Administrative Remedies with Respect to the
           Non-ERISA Bellwether Claims............................................................................35

IV.    There Are Disputed Issues of Fact as to Whether The Bellwether Claims Were Properly Paid.............................................................................................................36

        A.    Whether Defendants Properly Paid the Bellwether Claims in Accordance with the Greatest of Three Rule Is Disputed..............................................36

        B.    The Greatest of Three Rule is Not Geographically Limited................................38

        C.    Defendants Did Not Verify Greatest of Three Compliance for the Bellwethers ....................................................................................................41

        D.    There are Factual Disputes as to Whether Defendants' Payments Based on Other Methodologies Complied with the Greatest of Three..................................43

        E.    Defendants Abused Their Discretion in Paying the Bellwether Claims...............43

        F.    The Payment for Nearly Every Bellwether Failed One of Three Benchmarks....................................................................................................44

V.    Genuine Issues of Material Fact Exist as to Whether Plaintiffs' Claims Are Timely .............................................................................................................45

        A.    None of the Bellwether Claims Is Barred Pursuant to the Texas Statute of Limitations ..................................................................................................46

        B.    There Are Disputed Issues of Fact as to Whether Plaintiffs' Claims Are Barred by Contractual Limitations in Plan Documents .........................................48

VI.    There Are Disputed Issues of Fact as to Whether Health Plans Exempt from ERISA Were Properly Sued..................................................................................49

VII.    There Are Disputed Issues of Fact as to Whether Defendants Are ERISA Fiduciaries with Respect to Certain Plans .........................................................50

CONCLUSION...................................................................................................50

CERTIFICATE OF SERVICE .............................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Addicks Servs., Inc. v. GGP-Bridgeland, LP*,
    596 F.3d 286 (5th Cir. 2010) ................................................27

*AIG Life Ins. Co. v. Blackshear*,
    2002 WL 1397112 (5th Cir. 2002) ..........................................15, 16

*Am. Coll. of Emergency Physicians v. Price*,
    264 F. Supp. 3d 89 (D.D.C. 2017)..........................................9, 10

*Barnett v. Houston Natural Gas Co.*,
    617 S.W.2d 305 (Tex. Civ.—El Paso, 1981).................................48

*Belliveau v. Barco, Inc.*,
    987 F.3d 122 (5th Cir. 2021) ..............................................8

*Blankenship v. Liberty Life Assurance Co. of Bos.*,
    2004 WL 1878211 (N.D. Cal. Aug. 20, 2004), *aff'd,* 486 F.3d 620 (9th Cir.
    2007) .....................................................................16

*Bryant v. Cmty. Bankshares, Inc.*,
    265 F. Supp. 3d 1307 (M.D. Ala. 2017), *aff'd*, 736 F. App'x 841 (11th Cir.
    2018) .....................................................................44

*Cell Sci. Sys. Corp. v. La. Health Serv.*,
    804 F. App'x 260 (5th Cir. 2020)..........................................30

*Continental S. Lines, Inc. v. Hilland*,
    528 S.W.2d 828 (Tex. 1975)................................................46

*Crosby v. La. Health Serv. & Indem. Co.*,
    647 F.3d 258 (5th Cir. 2011) ..........................................*passim*

*Ctr. for Restorative Breast Surgery, L.L.C. v. BCBS of Louisiana*,
    2016 WL 7468165 (E.D. La. May 6, 2016)..................................48, 49

*Cummings v. HCA*,
    799 S.W.2d 403 (Tex. App 1990)............................................46

*Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*,
    938 F.3d 246 (5th Cir. 2019) ..............................................30

*Ebert v. Gustin*,
    2017 WL 11491878 (N.D. Tex. June 14, 2017) ...............................4

*Encompass Off. Sols., Inc. v. Conn. Gen. Life Ins. Co.,* No. 3:11-CV-02487-L,
    2017 WL 3268034, at *6 (N.D. Tex. July 31, 2017) ......................................................19, 21

*Encompass Off. Sols., Inc. v. La. Health Serv. & Indem. Co.*,
    No. 3:11-CV-1471-P, 2013 WL 12310676 (N.D. Tex. Sept. 17, 2013),
    modified on reconsideration, No. 3:11-CV-1471-P, 2014 WL 12980010 (N.D.
    Tex. Apr. 29, 2014)...................................................................................................... *passim*

*Encompass Office Soln's Inc. v. La. Health Serv. & Indemnity Co.*,
    919 F.3d 266 (5th Cir. 2019) ...................................................................................................29

*Flour Bluff Indep. Sch. Dist. v. Bass*,
    133 S.W.3d 272 (Tex. 2004) (per curiam)...............................................................................46

*Francois v. Our Lady of the Lake Hosp., Inc.*,
    8 F.4th 370 (5th Cir. 2021) .........................................................................................................8

*Gosselink v. Am. Telephone & Telegraph, Inc.*,
    No. Civ. A. H-97-3854, 1999 WL 33737443 (S.D. Tex. Aug. 9, 1999) ................................34

*Grand Parkway Surgery Ctr., LLC v. Health Care Serv. Corp.*,
    No. H-15-0297, 2015 WL 3756492 (S.D. Tex. June 16, 2015)...............................................27

*Guzman v. Allstate Assurance Co.*,
    No. 20-11247, 2021 WL 5228510 (5th Cir. Nov. 10, 2021) .....................................................8

*Hall v. Nat'l Gypsum Co.*,
    105 F.3d 225 (5th Cir. 1997) ............................................................................................34, 35

*Harris Methodist Fort Worth v. Sales Support Servs., Inc. Emp. Health Care
    Plan*,
    426 F.3d 330 (5th Cir. 2005) ..................................................................................18, 41, 48

*Heimeshoff v. Hartford Life & Acc. Ins. Co.*,
    571 U.S. 99 (2013)..............................................................................................................48, 49

*Hermann Hosp. v. MEBA Med. & Benefits Plan ("Hermann II")*,
    959 F.2d 569 (5th Cir. 1992), *overruled on other grounds by Access
    Mediquip, LLC v. UnitedHealthcare Ins. Co.*, 698 F.3d 229 (5th Cir. 2012)
    (per curiam)....................................................................................................................26, 27, 28

*Hess v. Hartford Life Acc. Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001).......................................44

*Highlands Ins. Co. v. Allstate Ins. Co.*,
    688 F.2d 398 (5th Cir. 1982) ...................................................................................................27

*Houston v. Texas Dep't of Agric.*,
    No. 20-20591, 2021 WL 5147939 (5th Cir. Nov. 5, 2021) .......................................................8

*IJKG Opco LLC v. Gen. Trading Co.*, 2019 WL 8164381, at *7 (D.N.J. Apr. 29, 2019) ................................................................................................................13

*Innova Hosp. San Antonio LP v. Health Care Serv. Corp.,* No. 3:12-CV-01607-O, 2019 WL 13177034 (N.D. Tex. Oct. 2, 2019) ...................................................23

*Jensen v. Solvay Chemicals, Inc.,* 520 F. Supp. 2d 1349, 1355 (D. Wyo. 2007) .........................13

*Johnson v. United Healthcare Ins. Co.,*
No. 4:18-cv-00591, 2019 WL 5901235 (E.D. Tex. July 26, 2019) ........................................50

*Kee v. City of Rowlett, Tex.*,
247 F.3d 206 (5th Cir. 2001) ................................................................................8, 50

*Koch v. Metro. Life Ins. Co.,*
425 F. Supp. 3d 741 (N.D. Tex. 2019) .................................................................14

*LeTourneau Lifelike Orthotics & Prosthetics, Inc. v. Wal-Mart Stores, Inc.,* 298 F.3d 348, 351 (5th Cir. 2002) ........................................................................29, 30

*LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs Inc.*,
703 F.3d 835 (5th Cir. 2013) ..............................................................................50

*Malbrough v. Kanawha Ins. Co.,*
943 F. Supp. 2d 684 (W.D. La. 2013).................................................................13

*Med. Soc'y of New York v. UnitedHealth Grp. Inc.*, 2017 WL 4023350 (S.D.N.Y. Sept. 11, 2017) ..........................................................................................25

*Montfort Square Shopping Center, Ltd. v. Goodyear Tire & Rubber Co.,*
2012 WL 2358163 (N.D. Tex. June 21, 2012) ....................................................4, 46

*Nall v. BNSF Ry. Co.*,
917 F.3d 335 (5th Cir. 2019) ................................................................................8

*N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare,* No. 4:09-CV-2556, 2018 WL 3738086, at *12 (S.D. Tex. Aug. 7, 2018), *aff'd*, 952 F.3d 708 (5th Cir. 2020) ........................................................................................................20

*Omega Hosp., LLC v. United HealthCare Servs., Inc.*,
No. CV 16-560-JWD-EWD, 2020 WL 7049857 (M.D. La. Dec. 1, 2020)...........................21

*OU Med., Inc. v. W.H. Braum Group Health Ben. Plan*,
Case No. CIV-21-67-J, 2021 U.S. Dist. LEXIS 246031 (W.D. Okla. May 4, 2021) ................................................................................................................25

*Piney Woods*, No. 5:20-CV-00041, RWS, 2021 WL 7184948 (E.D. Tex. Oct. 6, 2021) ................................................................................................................14

*Productive MD, LLC v. Aetna Health, Inc.*,
   969 F. Supp. 2d 901 (M.D. Tenn. 2013)......................................................................28, 29

*Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*,
   986 F.2d 580 (1st Cir. 1993).........................................................................................49

*Ryder v. Union Pac. R.R. Co.*,
   945 F.3d 194 (5th Cir. 2019).........................................................................................8

*Tango Transp. v. Healthcare Fin. Servs. LLC*,
   322 F.3d 888 (5th Cir. 2003).........................................................................................24

*Taylor Energy Co., L.L.C. v. Luttrell*,
   3 F.4th 172 (5th Cir. 2021)...........................................................................................8

*Taylor-Travis v. Jackson State Univ.*,
   984 F.3d 1107 (5th Cir. 2021), cert. denied, No. 20-1715, 2021 WL 4507798
   (U.S. Oct. 4, 2021).......................................................................................................8

*Texas Educ. Agency v. U.S. Dept. of Educ.*,
   908 F.3d 127 (5th Cir. 2018).........................................................................................40

*Theriot v. Building Trades United Pension Trust Fund*,
   850 F. App'x 231 (5th Cir. 2021)............................................................................33, 34

*Thomas v. Reeves*,
   961 F.3d 800 (5th Cir. 2020).........................................................................................40

*Toranto v. BCBSTX*,
   993 S.W.2d 648 (Tex. 1999).........................................................................................30

*Univ. of Wis. Hosps. & Clinics Auth. v. Costco Empl. Benefits Program*,
   15-cv-412-bbc, 2015 U.S. Dist. LEXIS 171088 (W.D. Wisc. Dec. 23, 2015)........................25

*Valley Reg'l Med. Ctr. v. Wright*,
   276 F. Supp. 2d 620 (S.D. Tex. 2001), *aff'd*, 61 F. App'x 121 (5th Cir. 2003) ...............22, 24

*Vega v. Nat'l Life Ins. Servs., Inc.*,
   188 F.3d 287 (5th Cir. 1999).................................................................................10, 12, 13

*Windmill Wellness Ranch, LLC v. Meritain Health, Inc.* No. SA-20-CV-1388,
   2021 WL 2635845, *5 (W.D. Tex. Jun. 25, 2021.................................................................25

*Wright v. Hernandez*,
   469 S.W.3d 744 (Tex. App.—El Paso 2015).......................................................................35

**Statutes**

42 U.S.C. § 300gg-19a (b)..........................................................................................12

42 U.S.C. § 1395dd *et seq.*..................................................................................5

Affordable Care Act..................................................................................2, 8, 9

Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ..........................2, 12

ERISA ................................................................................................ *passim*

No Surprises Act ............................................................................................9

Texas Insurance Code Section 1204.053 ........................................................30

**Other Authorities**

29 C.F.R. § 2560.503-1(g)(1)(i)–(iv)............................................................33

29 C.F.R. § 2560.503-1(h)...........................................................................33

29 C.F.R. § 2560.503-1(h)(2)(iii) ................................................................34

29 C.F.R. § 2560.503-1(l)..........................................................................6, 31

29 C.F.R. § 2560.503-1(l)(1).....................................................................33, 34

29 CFR 2520.104b–1 ....................................................................................16

29 CFR § 2520.104b–1 .................................................................................16

29 CFR § 2590.715-2719A (b)(1) ................................................................37

45 CFR § 147.138(b)(3)(i) .....................................................................9, 17, 39

75 Fed. Reg. 37,188, 37,194 (June 28, 2010) ...............................................9

80 Fed. Reg. 72192, 72192 (Nov. 18, 2015).................................................10

83 Fed. Reg. 19431, 19431 (May 3, 2018)....................................................10

83 Fed. Reg. 19433 ......................................................................................16

83 Fed. Reg. at 19435 ..................................................................................10

28 Tex. Admin. Code §3.3725(a) ..................................................................12

Fed. R. Civ. P. 15(c)(1)(A)...........................................................................46

Fed. R. Civ. P. 56(a) ...................................................................................4, 8

Federal Rule of Civil Procedure 15(c)...........................................................46

## <u>INTRODUCTION AND SUMMARY OF OPPOSITION</u>

Genuine issues of material fact exist as to all claims asserted by Plaintiffs, and Defendants are not entitled to judgment as a matter of law on any of the Bellwether Claims.  Contrary to Defendants' motion, whether Defendants' reimbursement to Plaintiffs complied with the Greatest of Three regulation is a textbook genuine issue of material fact.  Other key questions of material fact include whether: (1) Plaintiffs have standing, (2) Defendants waived their ability to rely on purported anti-assignment language in plan documents, (3) Plaintiffs exhausted administrative remedies or were excused, and (4) Plaintiffs complied with limitation periods.

In an attempt to establish the lack of factual disputes, Defendants set forth a number of statements that the record reveals to be half-truths or simply just wrong.  For example:

- Defendants say they do not have any records showing Plaintiffs sought administrative review, but the evidence demonstrates Plaintiffs did in fact submit appeals for the Bellwether Claims;

- Defendants say that the existence of anti-assignment provisions ends consideration of Plaintiffs' claims—this is untrue because the evidence demonstrates Defendants waived their ability to rely on anti-assignment provisions;

- Defendants claim that Blue Cross and Blue Shield of Texas ("BCBSTX") pricing complied with the Greatest of Three, but there is no evidence of that; and, the evidence demonstrates Defendants did not make any effort to determine whether BCBSTX pricing complied with state or federal law; and

- Defendants contend the Greatest of Three calculation is to be performed based up the location of the emergency service, but this statement is contradicted by the rule's plain text.

In sum, numerous disputed issues of material fact preclude judgment as a matter of law.

Defendants would like the Court to believe that this action is a typical, garden-variety ERISA claim for benefits—like a case where the Court reviews the same medical records that the plan administrator reviewed when it made a disability determination on a member.  Defendants are wrong.  At its core, this case is about Defendants' systematic failure to comply with federal law governing the reimbursement of emergency services.  The Patient Protection and Affordable

1

Care Act's ("Affordable Care Act") "Greatest of Three" regulation creates a uniform, minimum standard for what plans must pay out-of-network emergency providers. Regardless of what plan provisions may require for reimbursement to out-of-network emergency providers, the Greatest of Three regulation *requires* payment at levels well above what Defendants paid Plaintiffs.

**The case involves both ERISA violations and non-ERISA breach-of-contract claims**. A number of Bellwether Claims are not governed by ERISA and instead relate to insured, as opposed to self-funded, plans. For those claims, none of Defendants' arguments that attempt to limit the Court's review of ERISA claims even applies. Moreover, Defendants' contention that judicial review of the ERISA Bellwether Claims is limited lacks support. Plaintiffs do not allege that Defendants abused their discretion in deciding whether an ERISA plan provided *coverage* for a claim based on the administrative record. (Health plans are legally required to cover emergency services—coverage is not the issue.) Rather, Plaintiffs allege, and the evidence demonstrates, that Defendants abused their discretion by *completely failing to consider* binding federal law in calculating the reimbursement for the Bellwethers. Defendants' "trust but *don't* verify" approach to using BCBSTX rates to pay Plaintiffs is arbitrary and capricious.

**Plaintiffs have standing.** Plaintiffs provided life-saving emergency care to Defendants' members, and as emergency providers, they had no option but to treat members as required by the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. Plaintiffs are facility-based providers who staff hospital emergency departments, and as such, they regularly obtained assignments of benefits from the hospitals that the hospitals collected from patients as part of the registration process. The assignments allowed the hospitals and the Plaintiffs as providers in the hospital to bring suit under their patients' benefit plans. Defendants cannot rely on anti-assignment language to justify their refusal to honor assignments because Defendants

2

waived their ability to rely on such language.  The waiver arises from, among other things, Defendants' direct payment to Plaintiff for years for the emergency services that Plaintiffs provided to members.  A genuine issue of material fact exists as to whether Defendants waived the anti-assignment provisions included in health plan documents through their conduct.

*Plaintiffs exhausted administrative remedies.* Defendants state that "Defendants do not have any records showing that Plaintiffs sought administrative review in accordance with the relevant plan terms."  Defs.' Br. at 7.  But Defendants fail to inform the Court that *Plaintiffs* produced ample such evidence.  The record evidence demonstrates that Plaintiffs appealed the vast majority of Bellwether Claims.  In connection with their appeals, Plaintiffs requested plan documents and the plan methodologies, including the plans' methodology for performing the Greatest of Three calculation and data used to calculate the Greatest of Three. Plaintiffs requested plan documents over and over again, but Defendants never provided them.  And in a number of instances in which Defendants claim they have no record of an appeal, *Defendants* actually produced evidence of the appeal in litigation.  Because Defendants failed to comply with the ERISA claim procedure regulations, Plaintiffs' administrative remedies are deemed exhausted. For the Bellwether Claims lacking in appeals, a genuine issue of material fact exists as to whether Plaintiffs are excused from appealing on the basis of futility, including because BCBSTX sent boxes of unopened appeal letters back to Plaintiffs and in many cases never responded to appeals.

*Defendants cannot benefit from improper BlueCard confusion*.  In effect, Defendants, as out-of-state insurance plans, have taken advantage of the Blue Cross Blue Shield Association ("BCBSA") "rules," which direct Plaintiffs to interact solely with BCBSTX as the "host" plan instead of with the out-of-state Blue plan Defendants that are the entities financially responsible for the underpaid claims.  Defendants shirk their responsibility for adjudicating the claims—in

3

many cases claiming that they paid "what BCBSTX told us to pay." There is no evidence that either party—BCBSTX or the out-of-state Blue plan—took any action to determine whether the rate paid to Plaintiffs complied with the Greatest of Three. And as Plaintiffs' expert has now demonstrated, the majority of claims do not. Some Defendants also fault Plaintiffs for failing to submit appeals to Defendants, even though the BlueCard system requires appeals to be submitted to the "host" plan. Defendants cannot use the BlueCard "rules" as evidence to avoid liability for their significant underpayments that violate federal law. The BlueCard "rules" do not have the force of law and are simply what the Blue plans have agreed with each other to do.

*Chipping away at slivers of the case at this stage is inefficient.* Ultimately, a piecemeal dismissal of Bellwether Claims at the summary judgment stage is judicially inefficient. Granting some slivers of Defendants' motion for partial summary judgment will not serve to streamline the case. Indeed, in cases with this degree of complexity, numerous Defendants, and intertwined theories of liability, courts may exercise their inherent discretion and deny partial summary judgment to achieve a more expeditious handling of the entire case. *See Montfort Square Shopping Center, Ltd. v. Goodyear Tire & Rubber Co.*, 2012 WL 2358163, at *6 (N.D. Tex. June 21, 2012) ("Although Fed. R. Civ. P. 56(a) permits the court to enter partial summary judgment as to discrete components of a claim, a court in its discretion in shaping the case for trial, may deny summary judgment as to portions of the case that are ripe therefor, for the purpose of achieving a more orderly or expeditious handling of the entire litigation."); *Ebert v. Gustin*, 2017 WL 11491878, at *4 (N.D. Tex. June 14, 2017) (same). Plaintiffs respectfully request the Court exercise its discretion and deny Defendants' motion for partial summary judgment.

## FACTUAL BACKGROUND

### A.   Plaintiffs Provide Emergency Care to Defendants' Members

Plaintiffs are physician groups that provide emergency healthcare services at hospitals

across Texas and regularly serve patients who are members of BCBSTX and the out-of-state Blue plans that are Defendants in this lawsuit. (The claims submitted for actual members of BCBSTX, the majority of the claims originally in this case, have settled, leaving only the out-of-state Blue plans.) Plaintiffs were out-of-network during the relevant period with regard to the Blue plans' members receiving services in Texas, which means that Plaintiffs were not contractually bound to accept discounted rates of payment for the emergency services they provided to members of the Defendant plans. Appendix ("App.") 000024 (Ex. B, Declaration of A. Pape ("Pape Decl."), ¶ 6). Plaintiffs have provided and continue to provide emergency care to members of Blue plans, including the Defendant plans, without inquiry into the existence or nature of a patient's insurance coverage or ability to pay, as required by federal law. *See* App. 000027 (Ex. C, Declaration of P. Jordan ("Jordan Decl."), ¶ 4). *See also* 42 U.S.C. § 1395dd *et seq.*

### B.   Plaintiffs Possess Assignment of Benefits and Have Standing to Bring Suit

As emergency physicians, the Plaintiff physician groups staff the hospital emergency departments. They are what would be considered in the industry to be facility-based providers. App. 000027 (Jordan Decl., ¶ 3). In other words, these physicians are based in the Emergency Department of a hospital. Plaintiffs' priorities are to treat patients safely and efficiently in emergencies, and under those circumstances, Plaintiffs do not directly collect assignment of benefits forms from their patients. Instead, Plaintiffs rely on the hospitals to collect assignments at the time of the service as part of the registration process. *Id.*, ¶ 6. As Defendants admit, Plaintiffs follow a uniform process to collect assignment forms. Defs.' Br. at 6. The hospital staff obtains the assignments, and the assignment forms are sent electronically to Plaintiffs and are part of the electronic medical record. App. 000004-000005 (Dep. of P. Jordan, excerpts attached as Ex. A to App.). Plaintiffs' practice is to obtain assignments from the facilities they staff in this manner for patients they see in the Emergency Department. App. 000028 (Jordan Decl., ¶ 9).

### C.        Plaintiffs Exhausted Their Administrative Remedies

Plaintiffs have exhausted their administrative remedies because Plaintiffs submitted timely written appeals to BCBSTX as required by BlueCard "rules."  *See* App. 001718-19 (Dep. of T. Surratt, excerpts attached as Ex. H to App.); App. 001734-35 (Dep. of J. Griffin, excerpts attached as Ex. I to App.). Plaintiffs' appeals generally requested plan documents. *See, e.g.*, App. 001016, 001056, 001379, 001416, 001491.  The appeals also raised the plan's obligation to comply with the Greatest of Three.  *See, e.g.*, App. 000998, 001360, 001414, 001496, 001564; App. 001747-48, App. 001755-65, App. 001749 (Dep. of J. Sybrandy, excerpts attached as Ex. J to App.).

Even though Plaintiffs regularly submitted appeals, Plaintiffs are also excused from having to exhaust administrative remedies.  In instances when BCBSTX responded to Plaintiffs' appeals, BCBSTX failed to provide any meaningful reason for the underpayment, including failure to reference plan provisions and the Greatest of Three methodology.  App. 001091, 001153, 001478. Instead of providing the specific reason or reasons for the adverse determination as required by law, *see* 29 C.F.R. § 2560.503-1(l), in some cases, BCBSTX responded that the member should contact the home plan instead of the provider contacting BCBSTX.  App. 000031 (Jordan Decl., ¶ 25); App. 000335.  This instruction conflicts with the BlueCard system "requirement" that providers only communicate with the "host" plan (here, BCBSTX).  *See* App. 001709.  Because BCBSTX, as Defendants' agent, consistently failed to provide the information that 29 C.F.R. § 2560.503-1(l) requires, Plaintiffs are deemed to have exhausted the administrative remedies under the health plans involved because Defendants, who ceded responsibility to BCBSTX for handling claim appeals, failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.  *See* 29 C.F.R. § 2560.503-1(l).  Moreover, in instances where Plaintiffs contacted the home plans for purposes of appealing the underpaid claims, they were in turn instructed to submit appeals to the "host" plan (BCBSTX).  App. 000031 (Jordan Decl., ¶ 26);

App. 001771-72 (Dep. of W. Cox, excerpts attached as Ex. K to App.).  In other instances, instead of responding to Plaintiffs' appeals, BCBSTX boxed up appeals and shipped them back to Plaintiffs without providing any responses to the appeals.  *Id.*, ¶ 27.  In other cases, BCBSTX said it was unable to process the request due to purported missing information.  App. 000603.  In some cases, BCBSTX never responded to Plaintiffs' appeals.  App. 000031 (Jordan Decl., ¶ 28).  In the alternative, therefore, it would have been futile for Plaintiffs to exhaust administrative remedies.

> ### D.   The Byzantine Nature of the BlueCard System Leaves Plaintiffs in the Dark as to How Their Claims Are Adjudicated, Who Is Adjudicating the Claims, and the Standards that Are Applied when the Claims Are Adjudicated

Defendants participate in the BlueCard system.  Defs.' Br. at 5.  Pursuant to the BlueCard system, providers are required to submit all claims for services provided to out-of-state Blue plan members through the "host" or "local" Blue plan.  *See* App. 001709.  Moreover, providers can only communicate with the "host" plan, must submit appeals to the "host" plan, and receive payment directly from the "host" plan, regardless of the member's "home" plan, and even though the "home" plan is financially responsible for the claim.  *Id.*  The BlueCard system keeps providers in the dark as to the interactions between "host" and "home" plan.  The identities of the "home" plans are often not transparent to Plaintiffs.  App. 000024 (Pape Decl., ¶ 7).  Here, the "host" plan is BCBSTX, and Defendants are the "home" plans.  Plaintiffs lack visibility into the process by which BCBSTX or Defendants adjudicate the claims that Plaintiffs submitted to BCBSTX for services to members of the "home" plans, or how the BlueCard system is used to determine whether plan benefits would be paid and the amount of plan benefits to be paid.  *Id.*, ¶ 8; App. 001817 (Dep. of A. James, excerpts attached as Ex. L to App.).  Defendants attempt to hide behind BlueCard "rules" to avoid liability for their significant underpayments that violate federal law.

## SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate if the moving party shows "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Taylor Energy Co., L.L.C. v. Luttrell*, 3 F.4th 172, 175 (5th Cir. 2021); *Francois v. Our Lady of the Lake Hosp., Inc.*, 8 F.4th 370, 376 (5th Cir. 2021).  The moving party bears the burden of showing the Court that there is an absence of evidence to support the nonmoving party's case.  *Kee v. City of Rowlett, Tex.*, 247 F.3d 206, 210 (5th Cir. 2001).

A genuine issue of material fact exists when, "after considering the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, a court determines that the evidence is such that a reasonable jury could return a verdict for the party opposing the motion." *Houston v. Texas Dep't of Agric.*, No. 20-20591, 2021 WL 5147939, at *3 (5th Cir. Nov. 5, 2021) (quoting *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013).  In evaluating a motion for summary judgment, the Court must view all facts and reasonable inferences drawn from the record "in the light most favorable to the party opposing the motion."  *Belliveau v. Barco, Inc.*, 987 F.3d 122, 128 (5th Cir. 2021) (quoting *Waste Mgmt. of La., L.L.C. v. River Birch, Inc*., 920 F.3d 958, 964 (5th Cir. 2019)).  The Court, in determining the merits of a motion for summary judgment, "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Taylor-Travis v. Jackson State Univ.*, 984 F.3d 1107, 1112 (5th Cir. 2021), cert. denied, No. 20-1715, 2021 WL 4507798 (U.S. Oct. 4, 2021); *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019).  Further, the Court must "refrain from making credibility determinations or weighing the evidence."  *Ryder v. Union Pac. R.R. Co*., 945 F.3d 194, 199 (5th Cir. 2019).  If there is any genuine dispute of material fact that a trier of fact may reasonably resolve in favor of either party, ***then a motion for summary judgment must be denied***.  *Id*.; *Guzman v. Allstate Assurance Co*., No. 20-11247, 2021 WL 5228510, at *2 (5th Cir. Nov. 10, 2021).

**<u>LEGAL BACKGROUND – THE AFFORDABLE CARE ACT'S GREATEST OF THREE</u>**

Following the enactment of the Affordable Care Act, the Departments of Labor, Health

and Human Services, and the Treasury (the "Departments") recognized that patients were still at financial risk for large medical bills because providers could balance bill patients for the difference between the amount emergency providers billed and the amount paid by the plan.[1] The Departments explained, "It would defeat the purpose of the protections in the [Affordable Care Act] if a plan or issuer paid an unreasonably low amount to a provider," so it is "necessary that a *reasonable amount be paid* before a patient becomes responsible for a balance billing amount." 75 Fed. Reg. 37,188, 37,194 (June 28, 2010) (emphasis added).   To ensure that a "reasonable amount be paid for services by some objective standard," the Departments published an Interim Final Rule establishing that "a plan or issuer satisfies the copayment and coinsurance limitations in the statute if it provides benefits for out-of-network emergency services in an amount equal to the greatest of three possible amounts." *Id.  See also Am. Coll. of Emergency Physicians v. Price*, 264 F. Supp. 3d 89, 92 (D.D.C. 2017).  This rule, the so-called "Greatest of Three" rule, requires plans to pay *the greatest* of the following:

(A)   The *amount negotiated with in-network providers* for the emergency service furnished (if there is more than one amount negotiated with in-network providers for the emergency service, the amount described under this paragraph is the median of these amounts);

(B)   The *amount for the emergency service calculated using the same method the plan generally uses to determine payments for the out-of-network services (such as the usual, customary, and reasonable amount)*; or

(C)   The amount that would be paid under Medicare for the emergency service.

45 CFR § 147.138(b)(3)(i).

---

[1]Congress later dealt with this balance billing problem in separate legislation when, in December 2020, it enacted the No Surprises Act, H.R. 3630, 116th Congress (2020). The claims at issue in this case relate to dates of service before the effective date of the No Surprises Act.

The Greatest of Three rule was incorporated into ERISA, and ERISA plans are required to comply with the regulation.  *See* 83 Fed. Reg. 19431, 19431 (May 3, 2018).[2]  The Departments clearly intended that providers be able to challenge the calculation of the Greatest of Three  through litigation.   Following  the  publication  of  the  Interim  Final  Rule,  some  providers  submitted comments  and  initiated  litigation  against  plans  raising  concerns  that  the  manner  in  which  the Greatest of Three is calculated lacks transparency and is inaccurate.  *See Am. Coll. of Emergency Physicians*, 264 F. Supp. 3d at 92.  In response, the Departments issued a final clarifying rule explaining that plans and issuers are "***required to disclose how [they] calculate[] the amounts under the GOT regulation***, including the UCR amount[.]"  83 Fed. Reg. at 19435 (emphasis added).  "To the extent that a provider is not able to obtain these calculations," patients and providers are safeguarded by the "***ability to obtain and to potentially challenge*** the information ***through litigation*** or the appeals process."  *Id*. at 19435 (emphasis added).

## ARGUMENT

## I.   JUDICIAL REVIEW IS NOT LIMITED TO THE ADMINISTRATIVE RECORD

Defendants argue that, as to the ERISA claims, judicial review should be limited to the "administrative record," citing the Fifth Circuit's decisions in *Crosby v. La. Health Serv. & Indem. Co*., 647 F.3d 258 (5th Cir. 2011), and *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287 (5th Cir. 1999).  Defs.' Br. at 9.  Defendants contend that the court's evidentiary review in ERISA cases is limited when (1) the plaintiff challenges an ERISA administrator's benefit determination, and (2) the plaintiff asks the court to review "factual questions" relating to the "merits of that benefit determination."  Defs.' Br. at 9-10.  Here, however, the record evidence the Court may consider is

---

[2]Indeed, the Greatest of Three applies to both fully insured and self-funded plans.  80 Fed. Reg. 72192, 72192 (Nov. 18, 2015) (the preamble to the final rule states that "the term 'group health plan' includes both insured and self-insured group health plans'").

not limited to the administrative record because Plaintiffs are not disputing the administrators' coverage *or* factual determinations.  Put simply, Plaintiffs do not allege that Defendants abused their discretion in deciding whether an ERISA benefit plan provided coverage for a claim based on the information presented in an administrative record.  Rather, Plaintiffs allege, and the evidence shows, that Defendants abused their discretion and were arbitrary and capricious by disregarding federal law in calculating the reimbursement amount for the ERISA claims.

Indeed, the entire concept of an "administrative record" is amorphous and inapplicable here.  For example, Defendants cannot definitely explain what constitutes the administrative record in this case because there is no "administrative record" maintained regarding the BCBSTX payment recommendations and ultimate payments made.  *See, e.g.,*, App. 001790; App. 001862-63 (Dep. of H. Beba, excerpts attached as Ex. O to App.); App. 001753; App. 001839-40 (Dep. of D Asche, excerpts attached as Ex. M to App.); App. 001880-86 (Dep. of V. Williams, excerpts attached as Ex. Q to App.).  As further evidence of the inapplicability of the "administrative record" concept, Defendants were also at a loss to explain whether BCBSTX possessed the administrative record, whether Defendants possessed it, or there were separate administrative records maintained by the host and home plans.  App. 001821-25.

Ultimately, what is at stake here is ***not*** whether benefits are afforded, but whether Defendants complied with a federal law governing rates *that Defendants indisputably must follow*. Moreover, Plaintiffs meet a number of well-established exceptions to the administrative record limitation.  But even if the record is limited to the administrative record, Plaintiffs have established a factual dispute as to the contents of the administrative record.

### A.    This Is Not a Classic Benefits Determination ERISA Suit, and the Administrative Record Limitation Does Not Apply

The "administrative record" concept on which Defendants rely arises from cases in which

11

a plan participant challenges an ERISA administrator's determination of coverage—in other words, does the benefit plan cover a given item or service.  There, the relevant inquiry was whether the administrator abused its discretion by denying coverage based on the record before it at the time of the determination of coverage.  *See Vega*, 188 F.3d at 299 (in a case involving a denial of health benefits, court held that "the district court is precluded from receiving evidence to resolve disputed material facts," and refused to admit evidence relating to whether claimant had notice of her condition before she applied for plan membership); *Crosby*, 647 F.3d at 263 (in finding that *Vega* prohibits the admission of evidence "to resolve the merits of coverage determination," stating that "[a] plan participant is not entitled to a second chance to produce evidence demonstrating that coverage should be afforded").  Both cases held that when resolving the merits of the plan's coverage determination—i.e. ***whether coverage should have been afforded under the plan***—a court is limited to reviewing the administrative record.  *Crosby*, 647 F.3d at 263; *see also Vega*, 188 F.3d at 300 (defining "administrative record" as "relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it").

However, here there is no dispute with respect to any Bellwether Claim that the given health plan "covers" the emergency services at issue.  Federal and state law require health plans to cover emergency services, and all parties agree that the Bellwether claims were for emergency services.  *See* 42 U.S.C. § 300gg-19a (b); 28 Tex. Admin. Code §3.3725(a).[3]  Neither *Vega* nor *Crosby* applies to restrict the record in a case such as this challenging the ***level of payment*** for services that are indisputably covered by the individual's health plan (because they must be by

---

[3]Under EMTALA, emergency medical providers are required, regardless of payment or the patient's insurance status, to provide medical screening and treatment necessary to stabilize the medical condition or until the patient can be transferred.  *See* 42 U.S.C. § 1395dd(a, b).

law).  Where, as here, the action raises questions other than that of a coverage determination, admissible evidence is not limited to the administrative record.  *See, e.g., Encompass Off. Sols., Inc. v. La. Health Serv. & Indem. Co.*, No. 3:11-CV-1471-P, 2013 WL 12310676, at \*5 (N.D. Tex. Sept. 17, 2013), modified on reconsideration, No. 3:11-CV-1471-P, 2014 WL 12980010 (N.D. Tex. Apr. 29, 2014) (The "Court is limited to the administrative record only when it is determining the "merits of the coverage determination" meaning "the factual determinations by the plan administrator, not policy interpretations."); *Crosby*, 647 F.3d at 263 ("*Vega* does not . . .  prohibit the admission of evidence to resolve other questions [such as whether the administrative record is complete, whether the plan administrator complied with procedural regulations, and whether there is a conflict of interest] that may be raised in an ERISA action.").  For example, in *Jensen v. Solvay Chemicals, Inc.*, plaintiffs alleged that an amendment to a pension plan was a violation of ERISA accrual requirements, rather than a denial of benefits, and the court held that plaintiffs were not limited to the administrative record.  520 F. Supp. 2d 1349, 1355 (D. Wyo. 2007).  *See Malbrough v. Kanawha Ins. Co.*, 943 F. Supp. 2d 684, 693 (W.D. La. 2013) ("The dispute in this case does not center around how [the administrator] interpreted the Policy, but instead centers around materials outside of the Policy and outside of the administrative review process.")[4]

In addition, Plaintiffs are not asking the Court to review "factual questions" that the plan

---

[4]Defendants cite *IJKG Opco LLC v. Gen. Trading Co.* (Defs.' Br. at 10), but the case is not determinative. No. CV 17-6131 (KM), 2019 WL 8164381, at \*7 (D.N.J. Apr. 29, 2019). Defendants argue that *IJKG Opco* settles the issue of whether evidence outside of the administrative record may be considered in a challenge to an ERISA plan's payment rate in violation of the Greatest of Three rule. *Id.*  But *IJKG Opco* is distinguishable because the relevant inquiry in that case was whether the claims were for emergency services ***at all*** such that the Greatest of Three rule even applied. *Id.* ("[T]he parties disagree as to whether the services provided by BMC were in fact emergent."). Here, all parties agree the claims were for out-of-network emergency services. Also, *IJKG Opco* was decided on a motion to compel, and this Court has already permitted discovery outside of the purported administrative record.  (Dkt. 354; 371).

administrators "addressed to determine benefits." Defs.' Br. at 10. The evidence overwhelmingly demonstrates that the plan administrators did nothing to review whether reimbursements for the Bellwethers complied with the Greatest of Three. *See, e.g.,* App. 001812-13; App. 001841. Instead, the plan administrators simply ignored the federal law in determining the reimbursement. Thus, it cannot be the case that the Court's review of the administrators' Greatest of Three "evaluation" is limited ***when the administrators did not even evaluate the payments' compliance with the Greatest of Three requirement or perform any analysis to measure it.*** *See, e.g.,* App. 001852-53 (Dep. of K. Bortz, excerpts attached as Ex. N to App.); App. 001781-82.[5] At minimum, summary judgment is not appropriate because there are disputed issues of material fact related to the administrators' review of the administrative record. *See Koch v. Metro. Life Ins. Co.*, 425 F. Supp. 3d 741, 745 (N.D. Tex. 2019) ("The Court finds that the administrative record includes genuine issues of material fact and concludes that an independent review of the administrative record—not summary judgment—is necessary to resolve this dispute.").

## B.   Plaintiffs' Claims Meet Exceptions to the Administrative Record Limitation

Moreover, even in the classic ERISA coverage case (of which this is not), the Fifth Circuit has explained there is "no reason to limit the admissibility of evidence . . . to that contained in the administrative record . . . where evidence resolving these disputes ***may not be contained in the administrative record***." *Crosby*, 647 F.3d at 263 (emphasis added). Courts in the Fifth Circuit

---

[5] Defendants cite *Piney Woods ER III, LLC v. BCBSTX* to argue that an underpayment is a partial denial of benefits and thus Plaintiffs' dispute relates to coverage determinations. Defs.' Br. at 10 (citing *Piney Woods*, No. 5:20-CV-00041, RWS, 2021 WL 7184948 (E.D. Tex. Oct. 6, 2021)). But the *Piney Woods* court ultimately ordered broad discovery well beyond what Defendants here contend constitutes the administrative record. Specifically, the court ordered production of data showing contracted and non-contracted rates and calculation of the usual and customary rates, policies on billing, collections, and appeals, and documents produced by the plan to the Texas Department of Insurance relating to the plan's out-of-network emergency claim processing. *Piney Woods*, 2021 WL 7184948, at *3-6. In other words, the court did not limit the administrative record and in fact ordered discovery broader than what this Court compelled in this case.

have applied this rationale to recognize a number of scenarios where evidence outside of the administrative record is appropriate to consider in an ERISA benefits proceeding, including: (1) Completeness of the administrative record (*Crosby*); (2) Compliance with ERISA procedural regulations (*Crosby*); (3) Existence and extent of administrator conflict of interest (*Crosby*); and (4) Evidence that the claimant did not previously have the opportunity to present to the administrator (*AIG Life Ins. Co. v. Blackshear*, 2002 WL 1397112, at *2 n.4 (5th Cir. 2002)).

Plaintiffs have challenged the completeness of the administrative record and have shown that Defendants frustrated Plaintiffs' attempt to put critical evidence into the administrative record. For many of the Bellwether Claims, appeal letters filed by Plaintiffs and produced by Defendants demonstrate that Plaintiffs requested documentation to evaluate the contents of the administrative record. In one version of appeal letters, Plaintiffs requested documents in the following categories: plans, policies and procedures; internal rules, guidelines protocols or criteria relied upon in making adverse benefit determinations; documents underlying the calculation of "usual, customary and reasonable rates"; all records and documents relevant to the adverse benefit determination; identification of medical experts relied upon; identification of the plan administrator and contact information; confirmation of whether the plan administrator retained discretionary authority or delegated the responsibility; and identification of the fiduciary designated to review benefit denials and make decisions on appeals. *See e.g.*, App. 001083, 001015, 001401, 001522, 001554.[6]

Importantly, Plaintiffs requested, and Defendants were obligated to disclose, the

---

[6]These appeal letters were in almost all cases submitted to BCBSTX (instead of to Defendants) as required by the Blue Card terms. *See infra* Sec. III; *see also* App. 000030 (Jordan Decl., ¶¶ 18-19). Legally, however, the out-of-state Blue plan Defendants retained the payment obligation and the concomitant compliance obligation with the Greatest of Three regulation. *See, e.g.,* App. 001858-59; App. 001870 (Dep. of A. Chambers, excerpts attached as Ex. P to App.); App. 001847.

documentation and data used to calculate the amounts under each Greatest of Three prong. *See* 29 CFR § 2520.104b–1; 83 Fed. Reg. 19433 ("[D]ocumentation and data used to calculate each of the amounts under the GOT regulations for out-of-network emergency services, including the UCR amount, are considered to be instruments under which the plan is established or operated and ***would be subject to the disclosure provisions*** under section 104(b) of ERISA and 29 CFR 2520.104b–1[.]" (emphasis supplied)).   Here, however, no procedure remotely resembling disclosure was followed.   Plaintiffs asked for Greatest of Three information in multiple rounds of appeals, including requests for information related to the payment rate calculation under the Greatest of Three rule.   *See e.g.*, App. 001408 (requesting "all documents used to determine the allowed amount concerning the services referenced above, including but not limited to rates tables, fee schedules, database formulas, methodologies, criteria and industry protocols or guidelines used to calculate the allowed amount, along with all material facts and resources used to determine the approved rate for out-of-network emergency services."); App. 000030 (Jordan Decl., ¶ 17), Ex. 2. But Defendants failed to make the obligatory disclosures or provide the other requested information either prior to litigation, or through the voluntary discovery process.

By failing to provide Plaintiffs with the claims data to which they are entitled, Defendants effectively denied Plaintiffs the opportunity to evaluate and supplement the administrative record. ***Where Plaintiffs are denied the opportunity to supplement the administrative record prior to litigation, the court is not limited to the administrative record on review***.  *See AIG Life Ins. Co.*, 2002 WL 1397112, at *2 n.4; *see also Blankenship v. Liberty Life Assurance Co. of Bos.*, 2004 WL 1878211, at *6 (N.D. Cal. Aug. 20, 2004), *aff'd,* 486 F.3d 620 (9th Cir. 2007).

In addition to denying Plaintiffs the opportunity to supplement the administrative record, Defendants are in the exclusive possession of the claims data, past payment information, in-

network contracts, network rates, and other related information that Plaintiffs required in order to place such information into the "administrative record." ***Plaintiffs even requested this information in connection with the appeals process, and Defendants refused to provide it***. *See e.g.* App. 001015, 001083, 001114, 001401.  Defendants exclusively possessed the information needed to perform the Greatest of Three calculation but denied Plaintiffs' many attempts to gain access to the data.  (Indeed, even after Plaintiffs filed litigation, Defendants denied Plaintiffs access to the data until two federal judges ordered it produced.)  Defendants' disregard for Plaintiffs' requests further shows that Plaintiffs did not have the ability to evaluate the completeness of the administrative record prior to initiating litigation.  Defendants cannot gatekeep information in their sole control and then argue that a limitation on review forecloses consideration of information that they made a calculated decision to exclude despite Plaintiffs' request.

> **C.    Even If the Administrative Record Limitation Applies, this Court May Consider the Challenged Evidence Because Defendants Could Have Considered It In the Claims Adjudication Process**

Moreover, even if the evidentiary record is limited to the administrative record, much of the evidence that Defendants argue should not be considered is properly in the administrative record.  Specifically, the paid claims data and other information required for calculating the Greatest of Three is admissible evidence because it is in the *exclusive* control of Defendants. The information underlying the calculation of payments in accordance with the Greatest of Three rule was available to Defendants (and only to Defendants) in making the payment determination, and Defendants were required by federal law to consider the information in calculating the payment rate.  45 CFR § 147.138(b)(3)(i).  Thus, this information was properly part (or should be part) of the administrative record.  *See Encompass Off. Sols.*, 2013 WL 12310676, at *5 (rejecting Blue Cross plan's "unduly narrow" definition of the administrative record, and holding that evidence was part of the "administrative record" as long "as the information was available to [plan's]

17

administrator prior to [Plaintiff's] suit and the administrator had fair opportunity to rely on it"). If Defendants have their way, then ERISA administrators could shield themselves from litigation by unilaterally deciding not to consider relevant information that is made available to them that has the potential to frustrate their interests. This scenario presents an obvious potential for abuse. Where, as here, the administrator is in exclusive control of information that it is required by law to consider, that information is properly in the administrative record.

### D.       The Plan Administrators Acted in an Arbitrary and Capricious Manner

Finally, Defendants' contention that the Court must afford the ERISA benefits determinations a "very high level of deference" is wrong. *See* Defs.' Br. at 12. ***Defendants admitted in pleadings, oral argument testimony, in responses to interrogatories, and in deposition testimony that Defendants did not consider, much less evaluate compliance with, the federal Greatest of Three regulation or state law in adjudicating the Bellwether Claims***. *See, e.g.,* App. 001792-94; App. 001860; App. 001812-13; App. 001895-96 (Dep. of M. McComb, excerpts attached as Ex. R to App.); App. 001876; App. 001837, App. 001837-38 (admitting that if BCBSTX told BCBSNE to pay $5 on an emergency claim, it would do so without any verification of BCBSTX's determination). Defendants' failure to consider federal or state law in setting the allowed amounts on the Bellwether Claims was arbitrary and capricious and an abuse of discretion. And in any event, for the fully insured Bellwethers, none of Defendants' arguments that attempt to limit the Court's review of ERISA claims to the administrative record even applies.

## II.       PLAINTIFFS HAVE STANDING TO BRING SUIT UNDER THEIR PATIENTS' HEALTH BENEFIT PLANS AND INSURANCE POLICIES

It is well-established in the Fifth Circuit that "a healthcare provider, though not a statutorily designated ERISA beneficiary, may obtain standing to sue derivatively to enforce an ERISA plan beneficiary's claim." *Harris Methodist Fort Worth v. Sales Support Servs., Inc. Emp. Health Care*

*Plan*, 426 F.3d 330, 333-34 (5th Cir. 2005). Defendants purport to divine and synthesize a "test" from case law that must be met for a provider to establish standing under ERISA. Defs.' Br. at 14. At the summary judgment phase, however, the question is not whether the evidence conclusively establishes Plaintiffs' claims, but only whether a genuine issue of material fact exists. Moreover, Defendants' actions contradict their argument that assignments of benefits do not exist for every Bellwether Claim. For 100% of the Bellwether Claims, Defendants acted consistent with their belief that valid assignments existed, because they paid Plaintiffs directly. *See, e.g.*, App. 001906 (Dep. of S. Hicks, excerpts attached as Ex. S to App.); App. 001849-50; App. 001910 (Dep. of T. Howitz, excerpts attached as Ex. T to App.); App. 001746; App. 001712, App. 001723.

### A.    Plaintiffs Have Sufficiently Demonstrated the Existence of Assignments of Benefits for All Bellwether Claims

Defendants contend that Plaintiffs have not produced any assignments "for many Bellwether Claims." Defs. Br. at 13, 17. However, Plaintiffs can demonstrate through written and testimonial evidence the existence of assignments of benefits for all Bellwether Claims.

Plaintiffs have produced written assignments for the vast majority of claims. But even for the small subset where no assignment was produced, the law is not as simple and straightforward as "no written assignment, no standing." Proving the existence of assignments of benefits at the summary judgment phase or at trial does not require a party to produce written assignments for every patient. Rather, the Northern District of Texas has recognized that a party may demonstrate the existence of assignments, through deposition and witness testimony, of a pattern of patients' assigning their benefits to providers. In *Encompass Off. Sols., Inc. v. Conn. Gen. Life Ins. Co.*, the court addressed on summary judgment whether a provider pursuing claims under ERISA was required to produce assignments for all claims. No. 3:11-CV-02487-L, 2017 WL 3268034, at *6 (N.D. Tex. July 31, 2017). The court ruled that there was no such requirement. *Id.* at *10.

19

Encompass was a vendor that assisted physicians who performed surgical procedures. *Id.* at *2. In response to Cigna's challenge that Encompass was required to produce written assignments of benefits, Encompass asserted that deposition testimony was sufficient to create a genuine issue of material fact "as to whether these patients assigned their benefits to Encompass either explicitly, through the execution of the 'Assignment of Benefits' form that has since been lost or misfiled, or implicitly by accepting medical services from Encompass after providing their insurance information with knowledge that Encompass would submit a claim to its healthcare insurer for payment." *Id.* at *7. Encompass further asserted that the deposition testimony showed it routinely received executed assignment forms from patients and it was Encompass's standard practice for patients to execute these forms prior to their surgical procedure. *Id.* at *6. The court concluded that the combination of oral testimony as to the existence of written assignments, production of some written assignments, and unrebutted deposition testimony that all assignments of benefits were signed, was sufficient to raise a genuine issue of material fact to preclude summary judgment. *Id.* at *9. Moreover, the court noted that "an assignment of a claim for benefits need not be in writing to be effective unless required by contract or statute." *Id.* at *10.

Other cases in the Fifth Circuit confirm the *Encompass* holding. For example, in *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, the court addressed whether plaintiffs were required to produce written assignments for all claims at issue to establish standing under ERISA. No. 4:09-CV-2556, 2018 WL 3738086, at *12 (S.D. Tex. Aug. 7, 2018), *aff'd*, 952 F.3d 708 (5th Cir. 2020). The Fifth Circuit held on appeal from a motion to dismiss that plaintiffs had standing when patients assigned their rights to plaintiffs under their insurance contracts. *Id.* On remand at the summary judgment stage, the plaintiffs could not produce written assignments for "a fraction of the benefits claims." *Id.* The district court concluded that the question whether patients actually

20

assigned their benefits was a disputed issue of material fact: "Based on reliable trial testimony that all patients actually assigned their benefits, this Court finds that all of the claims at issue were properly assigned to NCMC." *Id.*; *see also Omega Hosp., LLC v. United HealthCare Servs., Inc.*, No. CV 16-560-JWD-EWD, 2020 WL 7049857, at *17 (M.D. La. Dec. 1, 2020) (denying factual attack motion to dismiss on grounds that plaintiff produced documentary and testimonial evidence that assignments were executed before plaintiffs treated patients). As noted, here Defendants admit that Plaintiffs follow a uniform process to collect assignments of benefits. Defs.' Br. at 6.

Here, Plaintiffs have produced written assignments of benefits for 153 of the 182 remaining Bellwether Claims, which is more than 84% of the remaining Bellwether Claims. App. 000028 (Jordan Decl., ¶ 10). For the fraction of Bellwether Claims for which Plaintiffs have not produced written assignments of benefits, Plaintiffs can demonstrate the existence of assignments from patients treated by Plaintiffs through witness testimony. The hospitals where Plaintiffs' physicians provided emergency services routinely received executed assignments of benefits forms from patients. App. 000028 (Jordan Decl., ¶ 6); App. at 000004-5. Moreover, it was standard practice for patients to execute an assignment of benefits upon admission to the hospital. App. 000028 (Jordan Decl., ¶ 8). It was also a common practice for these assignments to cover hospital-based physicians. As in *Encompass Off. Sols., Inc.* and *N. Cypress Med. Ctr. Operating Co.*, Plaintiffs have produced written assignments for a majority of the claims at issue. *See* 2017 WL 3268034, at *6; 201Z8 WL 3738086, at *12. And for the remaining claims, witness testimony confirms the existence of assignments of benefits. At the very least, the written assignments and witness testimony, taken together, create a genuine issue of material fact as to whether assignments of benefits exist for every Bellwether Claim.

## B.  Plaintiffs Are the Named or Intended Assignees for the Bellwether Claims

Defendants contend that Plaintiffs are not mentioned by name as assignees for certain

21

Bellwethers and, as a result, do not have standing.  Defs.' Br. at 18.  But the summary judgment record shows that Plaintiffs are the named or intended assignees for the Bellwether Claims.

In determining whether a party has obtained valid assignments, courts interpret the assignments in accordance with Texas contract law principles and any ERISA plan documents in accordance with ERISA principles.  *See Encompass Off. Sols., Inc.*, 2017 WL 3268034, at *7.  For a written assignment, courts examine and consider the entire writing and give effect to all provisions of the assignment so that "none [is] rendered meaningless."  *Id.* (quoting *Harris Methodist Fort Worth*, 426 F.3d at 334).  Contractual terms used in a written assignment are given "their plain, ordinary meaning unless the [assignment] itself shows that the parties intended the terms to have a different, technical meaning." *Id.*  If an assignment is written such that "it can be given a definite or certain legal meaning, it is not ambiguous." *Id.* (quoting *Harris Methodist Fort Worth*, 426 F.3d at 334).  But when an assignment is "subject to two or more reasonable interpretations, it is ambiguous and extrinsic evidence may be considered."  *Id.*  If the meaning of a contract is uncertain or doubtful, then summary judgment is improper.  *Valley Reg'l Med. Ctr. v. Wright*, 276 F. Supp. 2d 620, 627 (S.D. Tex. 2001), *aff'd*, 61 F. App'x 121 (5th Cir. 2003).

Here, Plaintiffs produced written assignments of benefits in which patients assigned their benefits to Plaintiffs as facility-based providers.  App. 000029 (Jordan Decl., ¶ 10).  The language in which these assignments are expressed varies based on the assignment form provided to patients at various hospitals where they were treated.  But assignments were made routinely, and the assignment forms confirm that fact.  Although the assignments do not expressly identify by name the Plaintiff entities that provided emergency services, they manifest the patient's clear intention to assign benefits to Plaintiff physicians providing care.  For example, the assignment of benefits for DBW01 assigns benefits and rights to "Wise Regional Health System *and any practitioner*

*providing care and treatment* to [the assigning patient]."  Defs.' App. 00000010 (emphasis added).

Another example is DBW36, which assigns benefits "to the Hospital and other Healthcare

Providers/Practitioners who furnish services to [the patient]."  Defs.' App. 00007777 (emphasis

added).  The language in these assignments can be given a definite or certain legal meaning—as

the physicians or providers who provided care to the assigning patients, Plaintiffs are assignees

according to these forms.  *See* App. 001728; App. 001729.

       Defendants argue for the opposite interpretation—that because the assignments for many

of the Bellwethers do not explicitly name Plaintiff entities as an assignee, no assignment was ever

effective.  Defs.' Br. at 18-21.  Defendants rely on *Innova Hosp. San Antonio LP v. Health Care*

*Serv. Corp.* to support their argument.  *Id.* at 14.  This reliance is misplaced.  In *Innova*, the court

addressed whether the plaintiff had valid assignments that conferred standing on "Victory Medical

Southcross" when the assignment assigned a patient's benefits to "Victory Parent Company LLC

d/b/a Victory Medical Center."  No. 3:12-CV-01607-O, 2019 WL 13177034, at *10-11 (N.D. Tex.

Oct. 2, 2019).  The court ruled that the plaintiff did not have standing because there was "no dispute

that Victory Parent Company and Plaintiff Victory Medical Solutions are separate legal entities."

*Id.* at *12.  Unlike in *Innova,* in this case there are not clearly separate legal entities from Plaintiffs

listed in assignments of benefits forms.  Here, the patients at issue assigned benefits to a class of

people, which is not surprising given that one does not typically know all the physician entities or

specialties that may ultimately be involved in providing treatment when a patient enters a hospital.

The assignments indicate an assignment to Plaintiffs as providers who provided services rather

than a separate legal entity, which is not surprising for emergency physicians.  Interpreting the

assignments in a way that bars Plaintiffs' claims as a matter of law reads too much into them.

       Moreover, Defendants attempt to pursue a hyper-technical distinction between Plaintiff

entities and the physicians who work for those entities.  Defs.' Br. at 20.  This is a distinction

without a difference.  When patients assign their benefits to physicians who provide them care and

those physicians are part of a physician group, as Plaintiffs are, the physician group falls within

the scope of that assignment.[7]  The nature of emergency care, which can include multiple providers

of various specialties providing care in different facilities, makes the creation of assignment forms

that identify individual providing physicians virtually infeasible.  App. 000028 (Jordan Decl., ¶ 7).

Basically, under Defendants' interpretation, there could be no effective assignment.

Finally, even assuming *arguendo* that the assignments were not clearly executed in

Plaintiffs' favor, they are at a minimum ambiguous.[8]  Such ambiguity precludes summary

judgment on the question of whether Plaintiffs are the named assignees of the assignments.  *See*

*Valley Reg'l Med. Ctr.*, 276 F. Supp. 2d at 627.

### C.    The Assignments of Benefits for Most Bellwether Claims Do Not Bar Plaintiffs from Asserting Causes of Action for Payment

The third element of Defendants' "test" purportedly requires Plaintiffs to "prove" that the

"assignment encompasses the right to bring and maintain this lawsuit."  Defs.' Br. at 21.

---

[7]In further support of this dubious distinction, Defendants cite *Tango Transp. v. Healthcare Fin. Servs. LLC*, 322 F.3d 888, 893-94 (5th Cir. 2003), and its indication that a provider can assign a patient's ERISA rights to a third party, and apparently conclude the following: because it was "undisputed" in *Tango Transp.* that the patient had assigned rights to a provider who then assigned those rights to a third-party, Plaintiffs cannot be valid assignees if Defendants dispute the validity of the assignments.  Def. Br. at 20 n.14.  In other words, Defendants suggest that simply because they "dispute" the validity of the assignments to Plaintiffs based on the spurious physician group-individual physician distinction, that is sufficient for the Court to dismiss some of Plaintiffs' claims.  But the distinction Defendants attempt to draw here—between individual physicians and the Plaintiff physician group entities—bears no resemblance to the distinction between entities in *Tango Transp.*—a provider and an unrelated healthcare financial services collection agency.
[8]Defendants speculated that "Plaintiffs may assert that these catchall terms are ambiguous and, as such, prevent the Court from ruling on the validity of their assignments."  Defs. Br. at 20 n.13.  Although this prediction turned out to be accurate, it should come as no surprise.  Defendants fail to explain in their footnote why the assignment terms cannot be ambiguous.

Defendants cite no cases in support of this proposition.

Instead, Defendants rely on cases addressing when courts have distinguished between an authorized representative and an assignee. Defs.' Br. at 22. In *Windmill Wellness Ranch, LLC v. Meritain Health, Inc.*, the court unsurprisingly found that a federal regulation did not confer standing on Windmill Wellness Ranch, an addiction recovery services provider, to sue in federal court. In other words, the federal regulation did not provide a cause of action to the plaintiff. No. SA-20-CV-1388, 2021 WL 2635845, *5 (W.D. Tex. Jun. 25, 2021). Plaintiffs make no such argument here, relying instead on the assignments that patients made in their favor. In *Med. Soc'y of New York v. UnitedHealth Grp. Inc.*, the plaintiffs tried to pursue claims as an "authorized representative" or "attorney-in-fact" to circumvent an unambiguous anti-assignment clause. No. 16-CV-5265 (JPO), 2017 WL 4023350, at *17 (S.D.N.Y. Sept. 11, 2017). Likewise, the courts in *OU Med., Inc. v. W.H. Braum Group Health Ben. Plan*, Case No. CIV-21-67-J, 2021 U.S. Dist. LEXIS 246031, at *5 (W.D. Okla. May 4, 2021), and *Univ. of Wis. Hosps. & Clinics Auth. v. Costco Empl. Benefits Program*, 15-cv-412-bbc, 2015 U.S. Dist. LEXIS 171088, *5 (W.D. Wisc. Dec. 23, 2015), were focused on distinguishing between an "authorized representative" and a recipient of an assignment. Again, Plaintiffs make no such argument. Plaintiffs contend only that the assignments they produced—which sometimes appoint Plaintiffs to act as a patient's authorized representative, often in conjunction with a clear assignment—are sufficient to show that patients intended to assign their rights and benefits and thus establish standing for Plaintiffs. It is also worth noting that none of these cases is binding on this Court.

Even if the Court were to accept the assignee-authorized representative distinction here, it would only apply to small subset of the Bellwether Claims. But even for these Bellwether Claims, applying the distinction here does not make sense, for there is clear intent by the patient to confer

25

on their healthcare providers both the benefits to which they are entitled and the right to pursue legal claims. To take the example that Defendants used in their brief, the assignment produced for PBW94 includes not only an appointment of Plaintiffs as authorized representative, but also an appointment for the hospital "to pursue any claims, penalties and administrative and/or legal remedies." Defs.' App. 00030689. Both the section assigning benefits to the hospital and the section assigning benefits to the physicians are labeled "Assignment of Benefits," and the patient states that they "assign" their rights and benefits. *See Encompass Off. Sols., Inc.*, 2017 WL 3268034, at *7 (for any written assignment received from patients, "the court examines and considers the entire writing and gives effect to all provisions of the assignment so that 'none [is] rendered meaningless'") (quoting *Harris Methodist Fort Worth*, 426 F.3d at 334). Plaintiffs routinely use assignments like these to pursue claims and payment from health plans. App. 000029 (Jordan Decl., ¶ 12). Reading these assignments in the cramped way that Defendants advocate would artificially constrict patients' ability to assign their rights and benefits to healthcare providers. Summary judgment is not proper in such circumstances, nor when Plaintiffs have demonstrated a genuine issue of material fact with respect to the Bellwether Claims assignments.[9]

### D.   Defendants Waived Their Ability to Rely on Any Anti-Assignment Provisions

Defendants next contend that "unambiguous anti-assignment provisions" in the relevant plan documents bar the assignments to Plaintiffs. Defs.' Br. at 15. However, the Fifth Circuit recognizes that the party relying on an anti-assignment provision to bar enforcement of an assignment can waive, or may be estopped to rely on, the anti-assignment clause. *See Hermann Hosp. v. MEBA Med. & Benefits Plan ("Hermann II")*, 959 F.2d 569, 574 (5th Cir. 1992),

---

[9] Defendants' corporate representatives were unable to provide any facts to support their positions that assignment of benefits for the Bellwether Claims were invalid or insufficient. *See, e.g.*, App. 001827; App. 001795; App. 001724, App. 001725-26, App. 001727; App. 001851; App. 001950 (Dep. of J. Marshall, excerpts attached as Ex. X to App.).

overruled on other grounds by *Access Mediquip, LLC v. UnitedHealthcare Ins. Co.*, 698 F.3d 229 (5th Cir. 2012) (per curiam); *see also Grand Parkway Surgery Ctr., LLC v. Health Care Serv. Corp.*, No. H-15-0297, 2015 WL 3756492, at *2 (S.D. Tex. June 16, 2015) ("In certain circumstances . . . the defendant may have waived or be estopped to assert the anti-assignment provision.").  The Fifth Circuit also recognizes that "[w]aiver is usually a question of fact to be determined by the jury or, in a bench trial, by the court."  *Highlands Ins. Co. v. Allstate Ins. Co.*, 688 F.2d 398, 404 (5th Cir. 1982); *see also Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 299 (5th Cir. 2010) (under Texas law "[w]aiver is ordinarily a question of fact").

Courts are particularly inclined to find an insurer waived an anti-assignment clause where the provider raising an underpayment claim pursuant to an assignment has no access to, and is not privy to, the underlying plan document containing the purported anti-assignment language, as is the case here.  For example, in *Hermann II*, the plaintiff "was not privy" to the plan document and "had no opportunity to review that documentation."  959 F.2d at 574.  The Fifth Circuit said it was the defendant's "responsibility to notify [the plaintiff] of that clause if it intended to rely on it to avoid any attempted assignments."  *Id.*  Moreover, the defendant was "estopped to assert the anti-assignment clause now because of its protracted failure to assert the clause when [the plaintiff] requested payment pursuant to a clear and unambiguous assignment of payments for covered benefits."  *Id.* at 575; *see also Encompass Off. Sols., Inc.*, 2017 WL 3268034, at *13 ("[T]he Fifth Circuit has held that a plan is precluded or estopped from raising the existence of an anti-assignment clause if it fails to assert and delays unreasonably in asserting the existence of the anti-assignment clause in response to a request for payment pursuant to an unambiguous assignment.")

Even if certain plan documents contain anti-assignment provisions, here, Plaintiffs were not privy to the plan documents containing the purported anti-assignment provisions through no

fault of their own.  App. 000029 (Jordan Decl., ¶ 15); App. 001657 (Ex. E, Declaration of T.

Proctor ("Proctor Decl."), ¶ 8.  Emergency room patients do not come to the hospital with their

ERISA plan documents, so Plaintiffs lacked any access to them.  Nonetheless, Plaintiffs repeatedly

requested plan documents and insurance policies as part of the appeals process.  App. 000029

(Jordan Decl., ¶ 16).  But Defendants never provided these plan documents to Plaintiffs.  *Id.*

Plaintiffs thus had no way of knowing that these patients at issue in the Bellwethers were

supposedly precluded from assigning their insurance or health plan benefits to Plaintiffs.  This is

particularly the case given that Defendants paid Plaintiffs directly for services provided to ***all***

Bellwether Claim patients despite the plans' purported anti-assignment clauses that these

Defendants emphasize so strenuously in their motion.  *See, e.g.,* APP. 001906; APP. 001746; APP.

001849-50.  Like the plaintiff in *Hermann II*, Plaintiffs had ***no opportunity*** to review the plan

documents before filing suit. *Hermann II*, 959 F.2d at 574; *see also Productive MD, LLC v. Aetna

Health, Inc.*, 969 F. Supp. 2d 901, 922-23 (M.D. Tenn. 2013) (provider was "not privy to" the

underlying plan terms, and that Aetna "had full information and every opportunity to raise the

assignment issue before this litigation, but never did so").  Indeed, Defendants raised the anti-

assignment clause for the first time in the context of this litigation.

Defendants also engaged in a course of conduct and payment history with Plaintiffs,

including Defendants' voluntary and intentional direct payment to Plaintiffs for past claims, that

gave no indication that they thought patients' benefits could not be assigned.  *See* App. 001657

(Proctor Decl. ¶ 7).  Pursuant to BlueCard system requirements, Plaintiffs submitted to BCBSTX

claim forms and appeals related to Defendants because BCBSTX was Plaintiffs' sole point of

contact. App. 000030 (Jordan Decl., ¶ 21).  Additionally, Plaintiffs were prohibited from

communicating directly with Defendants but they regularly communicated directly with BCBSTX.

*Id.* ¶ 22.  Plaintiffs routinely requested from BCBSTX, on a claim-by-claim basis, copies of plan documents that addressed payment of the relevant claim.  *Id.* ¶ 18.  Specifically, when Plaintiffs requested plan documents related to Defendants, BCBSTX instructed Plaintiffs to request the plan documents from Defendants, even though BCBSTX was supposed to be Plaintiffs' sole contact as the "local" plan for claims payments and related issues.  *Id.* ¶ 19.  Yet in instances when Plaintiffs attempted to obtain the plan documents from Defendants, they were directed to BCBSTX.  *Id.* ¶ 20.  When Plaintiffs received payment, it came from BCBSTX, which remitted payments on behalf of Defendants per BlueCard.  *Id.* ¶ 23.  *See, e.g.,* App. 001906; App. 001746; App. 001849-50.

Thus, Plaintiffs have sufficiently demonstrated that BCBSTX (as an agent for each of the Defendants) has waived, and is estopped to assert, its right to enforce the anti-assignment provisions in the plan documents.  *See Encompass Office Soln's Inc. v. La. Health Serv. & Indemnity Co.*, 919 F.3d 266, 281 (5th Cir. 2019) (upholding district court's finding "that BCBSLA waived the anti-assignment provisions because it made payments to, and communicated with, [the provider] on at least some claims," holding that waiver of the anti-assignment clauses was properly decided by district court, and stating that "the anti-assignment clauses do not frustrate [the provider's] recovery on ERISA claims"); *Productive MD, LLC*, 969 F. Supp. 2d at 925-26 (regularly paying provider's claims pursuant to assignments and consistently leading plaintiff to believe its assignments were valid could constitute waiver of anti-assignment provisions).

Defendants' cases cited in the brief are inapposite.  Defs.' Br. at 15-16.  For example, *LeTourneau Lifelike Orthotics & Prosthetics, Inc. v. Wal-Mart Stores, Inc.*, which was decided following a trial, was not litigated on a waiver or estoppel theory but rather on the theory that the anti-assignment clause only applied to "unrelated third-party assignees, such as creditors who might attempt to obtain voluntary assignments to cover debts having no nexus with the plan or its

29

benefits[.]"  298 F.3d 348, 351 (5th Cir. 2002).  *LeTourneau* also involved a "direct payment authorization," as opposed to an assignment, and the court also attached importance to the fact that the service had not been preapproved, a factor which is entirely irrelevant to the emergency services at issue here.  *Id.* at 350, 353.  The plaintiffs in *LeTourneau* also relied heavily on the direct payment authorization the patient signed but did not have the substantial dealings with the insurer that Plaintiffs have had with BCBSTX (as an agent for Defendants) in this case.[10] Specifically, Plaintiffs communicated with BCBSTX and Defendants about claims, requested plan documents, and submitted appeals. Plaintiffs' evidence sufficiently demonstrates waiver and estoppel to raise a genuine issue of material fact at the motion for summary judgment phase.[11]

## III.      PLAINTIFFS EXHAUSTED THEIR ADMINISTRATIVE REMEDIES

Although the record is replete with facts to the contrary, Defendants make a claim that "Plaintiffs made no effort to exhaust the members' administrative remedies prior to filing this lawsuit."  Defs.' Br. at 24.  Plaintiffs' corporate representative unambiguously testified that

---

[10]Defendants also cite *Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 251 (5th Cir. 2019), and *Cell Sci. Sys. Corp. v. La. Health Serv.*, 804 F. App'x 260, 265 (5th Cir. 2020), for the proposition that valid anti-assignment provisions in ERISA plans deprive providers of standing to sue under those plans. Defs.' Br. at 16.  Neither of these cases controls based on the facts of the instant case.  *Dialysis Newco, Inc.* involved the legal question whether the anti-assignment provision at issue was ambiguous. 938 F.3d at 250. Similarly, *Cell Sci. Sys. Corp.* did not involve the issue of waiver.  804 F. App'x 260.  It did contain in dicta a discussion of estoppel, but, unlike here, there was no evidence that the plaintiff was denied access to plan documents containing the anti-assignment clauses; that the plaintiff repeatedly requested them; or that the plaintiff submitted appeals and had extensive communications with the plan. *Id.* at 265.
[11] Defendants also argue that Texas Insurance Code Section 1204.053 "does not invalidate any anti-assignment clause at issue."  Defs.' Br. at 15 n.10.  Defendants are wrong.  Under Section 1204.053, insurers "may not deliver, renew, or issue for delivery in this state a health insurance policy that prohibits or restricts a covered person from making a written assignment of benefits to a physician or other health care provider who provides health care services to the person." Tex. Ins. Code § 1204.053.  Because Defendants are insurers that issue for delivery insurance policies in Texas, Defendants are statutorily required under Section 1204.053 to pay providers in Texas when the providers hold assignments of benefits from the member.  *Toranto v. BCBSTX*, 993 S.W.2d 648, 649 (Tex. 1999) ("[B]ecause BCBS is an 'insurer,' and the Plan's anti-assignment clause conflicts with the Insurance Code, the Plan's anti-assignment clause is invalid.").

Plaintiffs submitted timely written appeals to BCBSTX (as they were required to submit appeals to the "host" plan under the BlueCard system). App. 000006-000017. In addition, even if Plaintiffs hadn't submitted the requisite appeals, Plaintiffs are deemed to have exhausted the administrative remedies under the health plans involved because Defendants, who ceded responsibility to BCBSTX for handling claim appeals, failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim. *See* 29 C.F.R. § 2560.503-1(l). Moreover, Plaintiffs have raised a factual dispute as to whether exhaustion was futile.

As a preliminary matter, Defendants are unable to articulate what the appeal "requirement" to which Plaintiffs were subject actually was. App. 001710-11; App. 001814; App. 001921 (Dep. of J. Landers, excerpts attached as Ex. U to App.); App. 001754. Defendants have failed to identify which claims have ERISA exhaustion requirements, what those requirements are, and which claims are subject to insurance policies that required exhaustion. These facts alone should end the inquiry. Defendants also appear to fault Plaintiffs for failing to submit appeals to the home plans (i.e. to Defendants) as part of the exhaustion process. But Defendants also admit that Plaintiffs were ***required*** to send appeals challenging provider reimbursement to the host plan, which is BCBSTX. *See, e.g.*, App. 001709; App. 001773, App. 001783. Defendants claim they "have no record" of appeals, but they also admit that the expectation is that BCBSTX would not necessarily provide the appeal to Defendants if Plaintiffs were disputing the allowed amount. App. 001713-14; App. 001715-17 ("If the provider submitted the dispute, the Texas plan would review it. If the provider was disputing the allowance that Texas had applied to the claim, then it's accurate to say that would not have been sent to Elevance."). As the Anthem corporate representative testified:

> Q. You would agree, though, that based on the appeals we just reviewed, providers, the plaintiffs did submit, at least with respect to some of the Bellwethers we looked at, disputes over underpayment amounts to Blue Cross of Texas; right?
> A. I would agree they sent them to Texas.

> Q. And under the Blue Card rules, they were required to submit them to Texas; right?
> A. That is correct.

App. 001718-19; *see also* App. 001815-16; App. 001787-89; App. 001931 (Dep. of M. Darras,

excerpts attached as Ex. V to App.).  Defendants also admit that there is ***nothing more that***

***Plaintiffs could have done to appeal the underpaid Bellwethers:***

> Q. And plaintiffs challenged the pricing by submitting -- by disputing the underpayment
> and submitting that dispute to Blue Cross of Texas; right?
> A. Yes.
> Q. Are there any other steps Elevance contends plaintiffs should have done to challenge
> the underpayment?
> A. I don't know.
> Q. They complied with the Blue, plaintiffs complied with the Blue Card rule to submit
> their dispute to Blue Cross of Texas; right?
> A. They did.
> ***
> Q. And if plaintiffs had submitted their dispute over the underpayments to Anthem,
> Anthem would have said, wrong entity, go submit it to Blue Cross of Texas; right?
> A. They would have been directed to send it to their host plan.
> Q. Okay. So what more could plaintiffs have done here?
> ***
> A. I don't know.

App. 001720-21; App. 001721-22; *see also* App. 001879, App. 001888-90.

In addition, Defendants fault Plaintiffs for not submitting appeals "pursuant to appeals

procedures set forth in relevant health benefit plans."  Defs.' Br. at 26.  Defendants attempt to

distinguish between "member appeals" that challenge a benefit determination and "provider

appeals" that challenge reimbursement.  But Defendants admit that Plaintiffs had no way to access

the purported benefit plan language to submit an appeal on behalf of members, and in any event,

Defendants also admit that the types of appeals at issue in this case are appeals challenging

reimbursement, that are to be sent directly to BCBSTX, as Plaintiffs did:

> Q. Okay. So is it your testimony that, to exhaust the administrative remedy requirement,
> a provider in Texas would have to ask Texas what the requirement was, Texas would
> have to ask North Dakota what the requirement was, North Dakota would tell Texas,
> Texas would tell the provider, and then the provider would appeal to Texas?

A. So if it's regarding benefit determination, they would have to call regarding our appeal process and what our -- you know, does the member have one appeal, two appeals. Reimbursement-wise, as far as Texas's reimbursement, they should be contacting Texas regarding that. And I don't know what that appeal looks like.

App. 001939-40 (Dep. of M. Jackson, excerpts attached as Ex. W to App.); App. 001912-13; App. 001818.  Indeed, Defendants admit that when Plaintiffs did appeal to the home plan, the home plan in turn directed them to send the appeal back to BCBSTX.  App. 001784-86, App. 001800-03; App. 001877-78.  In effect, Defendants complain that Plaintiffs failed to take a futile action.

### A.   Plaintiffs Exhausted Their Administrative Remedies with Respect to the ERISA Bellwether Claims

Under ERISA (for the claims to which it applies), Defendants' health benefits plans must provide adequate written denials of claims, which must include: (i) the specific reason(s) for the adverse determination; (2) reference to the specific plan provisions on which the determination is based; (3) a description of any material or information necessary for the claimant to perfect the claim and an explanation of why it is necessary; and (4) a description of the plan's review procedures.  29 C.F.R. § 2560.503-1(g)(1)(i)–(iv); *see also Theriot v. Building Trades United Pension Trust Fund*, 850 F. App'x 231, 234 (5th Cir. 2021).  In addition, the benefit plans must offer "full and fair review" of the denial.  29 C.F.R. § 2560.503-1(h); *Theriot*, 850 F. App'x at 234.  If the plan administrator "failed to establish or follow claims procedures . . . a claimant is excused from failing to exhaust administrative remedies; the claimant is 'deemed to have exhausted the . . . remedies.'"  29 C.F.R. § 2560.503-1(l)(1).  *Id.* at 235.

In instances when BCBSTX responded to Plaintiffs' appeals, BCBSTX failed to provide any meaningful reason for the underpayment and failed to reference the plan provisions on which the adverse determination was based.  *See id*. § 2560.503-1(j) ("In the case of an adverse benefit determination, the notification shall set forth . . . [r]eference to the specific plan provisions on which the benefit determination is based."); App. 001804-06 (BCBSTX response letter merely

stating that "the claim disposition was based on the member's benefit coverage"). Instead of providing the specific reasons for the adverse determination as required by law, *see id*. § 2560.503-1(j)(l), in some cases, BCBSTX responded that the member should contact the home plan instead of the provider contacting BCBSTX. App. 001095, 001534; App. 000019. When Plaintiffs contacted the home plans, they were in turn instructed to submit appeals to the "local" plan, BCBSTX. App. 000031 (Jordan Decl., ¶ 26); App. 000018, 000020.

Plaintiffs' appeal letters generally requested plan documents as part of the appeal. *See* App. 001493. Plaintiffs were entitled to "reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." *See id*. § 2560.503-1(h)(2)(iii). Even though the transmitted appeal letters requested plan documents, BCBSTX also failed to provide plan documents concerning the claims that were appealed, in violation of 29 C.F.R. § 2560.503-1(h)(2)(iii). In short, BCBSTX's responses were erratic and provided unclear and often contradictory information, and neither BCBSTX nor Defendants addressed the appeals. Under these circumstances, Plaintiffs have demonstrated that they are deemed to have exhausted ERISA exhaustion requirements. *See* 29 C.F.R. § 2560.503-1(l)(1); *Theriot*, 850 F. App'x at 235.

In addition, exceptions to the exhaustion requirement exist where "the attempt to exhaust such remedies would be a patently futile course of action." *Gosselink v. Am. Telephone & Telegraph, Inc.*, No. Civ. A. H-97-3854, 1999 WL 33737443, at *2 (S.D. Tex. Aug. 9, 1999). Because BCBSTX failed to follow claims procedures required by ERISA, including by failing to respond to appeals and by failing to provide plan documents, Plaintiffs were excused from submitting claim appeals. The Fifth Circuit has held that when resort to administrative remedies would be futile, a court may exercise its discretion and find that "none of the purposes served by the exhaustion requirement would be met by denying the applicant access to the courts." *Hall v.*

34

*Nat'l Gypsum Co.*, 105 F.3d 225, 232 (5th Cir. 1997).  The "formalities" are particularly unnecessary when the "[ERISA] plan's review apparatus has been abolished[.]"  *Id.* at 232.  Here, Defendants contend that "[s]ince Plaintiffs never communicated with the Defendants concerning the claims, they plainly cannot show 'hostility or bias' on Defendants' part," and thus cannot claim exhaustion was futile.  Defs.' Br. at 22.  But the BlueCard system ***does not allow*** Plaintiffs to communicate directly with Defendants because Defendants are the home plans.  App. 001720-22.  In effect, under BlueCard, the appeal "apparatus" is designed such that Plaintiffs cannot appeal their claims directly to Defendants.  Under Defendants' theory, a plaintiff could never demonstrate futility of exhaustion as to a home plan.  At the very least, Plaintiffs have raised a genuine issue of material fact as to whether exhaustion of administrative remedies was futile.

### B.   Plaintiffs Exhausted Their Administrative Remedies with Respect to the Non-ERISA Bellwether Claims

Finally, with respect to the fully insured bellwether claims, Defendants maintain that exhaustion was a "condition precedent."  Defs.' Br. at 27.  But it is a question of fact as to whether complying with purported exhaustion "requirement" in "contractual provisions" is a condition precedent to filing a lawsuit.  Parties must express their intent to specifically require a condition precedent.  *See Wright v. Hernandez*, 469 S.W.3d 744 (Tex. App.—El Paso 2015) (stating in finding no condition precedent that "the parties' agreement in the present case did not contain any provision expressly requiring that the agreement itself or any modifications to the agreement be signed by the parties, and there are no other references in the agreement indicating that [the party's signature] was contemplated as a condition precedent to the agreement's enforceability").  Here, Defendants have failed to identify any provisions in insurance policies that required exhaustion and failed to establish an agreement to expressly require a condition precedent.  Thus, Plaintiffs were not required to appeal, and there are no "conditions precedent" to bringing this lawsuit.

35

**IV.     THERE ARE DISPUTED ISSUES OF FACT AS TO WHETHER THE BELLWETHER CLAIMS WERE PROPERLY PAID**

Defendants next argue that whether Defendants' reimbursements for the Bellwether Claims complied with the terms of the relevant plans and the Greatest of Three is not a factual dispute and instead turns on "purely legal issues." Defs.' Br. at 28.  This is one of the more astounding assertions that Defendants make.  While this dispute presents legal issues for the Court, it is far from true that there are no disputed issues of fact.  For example, Defendants claim that "[t]he use of BCBSTX pricing complied with the GoT rule applicable to the reimbursement of out-of-network emergency services." Defs.' Br. at 29.  But Defendants have no evidence to demonstrate BCBSTX's compliance with the Greatest of Three because they have no knowledge whatsoever of what BCBSTX pricing was based on. App. 001937 (BCBS North Dakota corporate representative testifying that she does not know what data elements or formula BCBSTX uses to come up with the recommended allowed amount); App. 001905 (Anthem corporate representative testifying, "I don't know Texas's methodology other than it's supposed to comport with all state and federal regulations"); App. 001812-13 (BCBS Arkansas/USAble corporate representative testifying, "USAble  would not be able to tell if . . . the host plan used the greatest of three"); App. 001846; App. 001848 (HealthNow corporate representative testifying that "I do not know how [BCBSTX] price[s]"); App. 001841 (Blue Cross and Blue Shield of Nebraska corporate representative testifying that "we're assuming Texas followed the 'Greatest of Three' in their calculation of the payment"); App. 001781-82; App. 001932 ("I really can't speak on behalf of Texas."); App. 001899-1900.  Defendants attempt to insulate themselves from liability by claiming that they merely applied claim pricing from BCBSTX. Defs.' Br. at 30.  But Defendants cannot pass off to another party their obligation to comply with federal law.

**A.     Whether Defendants Properly Paid the Bellwether Claims in Accordance with the Greatest of Three Rule Is Disputed**

36

The core issue of this case—whether Defendants properly paid the claims in accordance with the Greatest of Three rule, the plan documents, and insurance contracts—is a disputed issue of fact (and of expert opinion).  Defendants have a number of explanations for their payment rates: that they paid the BCBSTX rate, that they paid the rate required by the patient's plan, and that they paid the Greatest of Three rates.  Defs.' Br. at 28-29.  The problem for Defendants, however, is that the data they produced in this litigation does not support what they say are "undisputed facts." Instead, the data shows that for the vast majority of claims, Defendants failed at least one of three benchmarking tests analyzed by Plaintiffs' expert.  App. 001701-02 (Ex. G, Declaration of L. Fowdur, PhD ("Fowdur Decl."), ¶ 5).[12]

Defendants admit they are required to comply with the Greatest of Three rule and the Bellwether Claims must be paid in accordance with the Greatest of Three rule.[13]  *See* 29 CFR § 2590.715-2719A (b)(1); *see also, e.g.*, APP. 001847; App. 001897-98.  Yet Defendants admit they did not evaluate the data necessary to calculate the reimbursement rates under the rule, and thus did not consider it in adjudicating the Bellwethers. App. 001826 (stating that "we do not audit how other Blue Plans come up with their allowances"); App. 001847 (testifying that HealthNow did not undertake any analysis to confirm whether the local Blue plan's pricing complied with the Greatest of Three); App. 001832-33 (testifying that Blue Cross and Blue Shield of Nebraska does

---

[12] Defendants misleadingly state that Plaintiffs' expert analysis "shows that only 49% of the remaining Bellwether Claims were paid less than the GoT amount."  *See* Defs.' Br. at 29-30. Defendants entirely ignore that Dr. Fowdur analyzed three benchmarks—the average and median allowed rates of BCBSTX, the Greatest of Three, and the UCR rate based on 50th percentile of charges from the FairHealth database—and found that out of 178 Bellwether claims, 160 failed at least one of the three benchmarking tests.  App. 001701-02 (Fowdur Decl., ¶ 5).

[13] For the first time in this case's five-year history, Defendants contend in their moving papers that the Greatest of Three rule does not apply to "grandfathered Bellwether Claims."  Defs'. Br. at 28 n.18.  But Defendants do not appear to actually raise this issue an undisputed fact appropriate for summary judgment and instead "reserve their rights to raise grandfathered status."  *Id.*

not calculate the Greatest of Three for out-of-state claims and instead relies on BCBSTX); App. 001926-28; App. 001929-30; App. 001919; App. 001861; App. 001750-52; App. 001887. Defendants also admit they (as the home plans) could always apply pricing different from what BCBSTX (as the host plan) recommended and that they were not obligated to follow BCBSTX recommended pricing.  App. 001777-78; App. 001778-79; App. 001796-99.

Defendants lack any evidence to demonstrate that BCBSTX pricing complied with the Greatest of Three.  Not a single witness has substantiated (or can substantiate) that the Texas pricing complied with the Greatest of Three.  Nor can any witness explain how and whether the plan terms for the members whose claims comprise the Bellwethers complied with the Greatest of Three.  Instead, Defendants blindly trust without any verification that BCBSTX is "required to supply pricing that complies with the GoT rule" as required by BCBSA rules.[14]  *See* App. 001834, App. 001835, App. 001836.  But just because the BCBSA "rules" require compliance does not mean that BCBSTX or Defendants actually complied.[15]

### B.    The Greatest of Three Rule is Not Geographically Limited

Next, Defendants read a geographic limitation into the Greatest of Three rule to support their argument that Defendants are permitted to calculate the prongs of the Greatest of Three using BCBSTX data.  Defs'. Br. at 31.  First, this is nothing more than a hypothetical exercise because Defendants have admitted that they did not make an effort to calculate the rates under the rule—either geographically limited or otherwise.  *See e.g.* App. 001603 (Defendant BlueCross BlueShield of Tennessee describing reimbursement methodology for Bellwether claims with no

---

[14] The BCBSA does not monitor whether plans comply with the Greatest of Three, either. App. 001736.
[15] Indeed, Plaintiffs' expert determined that for the vast majority of Bellwether Claims, the allowed amount for the Bellwether Claim was lower than the average or median amounts that BCBSTX allowed.  Dkt. 421-1, Defs.' Appendix to Defs.' Motion to Strike or Exclude Expert Testimony of Dr. Lona Fowdur and Nathan Kaufman, Ex. A (Fowdur Rep. ¶ ¶ 17-18).

reference to Greatest of Three rule); App. 001644 (Defendant Wellmark Inc. and Wellmark of South Dakota, Inc. describing reimbursement methodology for Bellwether claims as determined only in reference to the "applicable Plan document(s)" and "pricing provided by BCBSTX."); App. 001826; App. 001847; App. 001832-33; App. 001926-28; App. 001929-30; App. 001919; App. 001861; App. 001750-52.   But in any event, the text of the Greatest of Three contains no geographic limitation with respect to the "amount negotiated with in-network providers" and the "amount for the emergency service calculated using the same method the plan generally uses to determine payments for out-of-network services (such as the usual, customary, and reasonable amount)."  42 CFR § 147.138(b)(3)(i).  Indeed, in addition to ignoring the rule's actual language, Defendants' interpretation leads to absurd results:  if, as Defendants argue, the amount negotiated with in-network providers (i.e., the first prong) is "interpreted to depend on in-network rates in the local area where a service is provided," (Defs.' Br. at 33), then there would be zero claims for this prong because, per BCBSA rules, Blue plans can only contract with providers within their own geographic territory.  *See id.* at 5.  Such a result contradicts Defendants' own locality criteria.

With respect to the Medicare amount, the Medicare prong of the Greatest of Three incorporates Medicare's payment methodology by referring to "the amount that would be paid under Medicare[.]"  To the extent that Medicare determines rates based on geography, this geographic limitation is incorporated through the express reference to Medicare rates and requires no engrafting of additional words onto the regulation.  ***The geographic limitations that Defendants hypothesize as to the other prongs do not tie to any actual words in the regulation***.  The agencies could easily have inserted "in the geographic area" in either of the two prongs but they did not.[16]

_____

[16] Defendants refer to the Medicare Physician Fee Schedule on the CMS website to argue that the "UCR amount likewise depends on prevailing rates in a particularly geographic area where a

*See Texas Educ. Agency v. U.S. Dept. of Educ.*, 908 F.3d 127, 132 (5th Cir. 2018) ("The meaning of a statute must, in the first instance, be sought in the language in which the act is framed.").

Defendants ask the Court to look to contextual clues to illuminate the meaning of the rules' prongs, citing *U.S. v. Kaluza*, 780 F.3d 647, 659 (5th Cir. 2015). But this same case makes clear that "[w]hen construing statutes and regulations, we begin with the assumption that the words were meant to express their ordinary meaning" and that looking to the larger regulatory scheme for context is only necessary where the text is ambiguous. Interpretive tools, such as those advanced by Defendants, are unnecessary where, as here, the plain language of the regulation is unambiguous. *See e.g. Thomas v. Reeves,* 961 F.3d 800, 812 (5th Cir. 2020) ("[Canons of interpretation] exist to clarify meaning, not to cloak it. And no canon, however esteemed, can defeat the obvious, non-absurd meaning of clearly drafted text.").

In the absence of any ambiguity, Defendants resort to arguing that there are implied limitations on the prongs based on speculative policy considerations. *See* Defs.' Br. at 33-34. Defendants argue that Plaintiffs' interpretation of the rule would lead to results that are—in Defendants' eyes—undesirable. But this is not for Defendants to decide when the Departments of the Treasury, Health and Human Services, and Labor have already spoken in clear terms. To the contrary, Plaintiffs are not advocating any policy arguments, but merely are demanding to be paid under the words of the regulation as written. The text of the regulation is clear and unambiguous, so there is no need to substitute Defendants' policy arguments for the reasoned and clear words the Departments published in the Federal Register. Defendants' resorting to far-reaching, extra-textual policy arguments demonstrate that summary judgment is not appropriate here. Defendants'

---

service is provided." Defs.' Br. at 32. But the Greatest of Three does not state that the prong addressing UCR varies by geography. Defendants' attempt to bootstrap a definition from a website to a federal regulation is inappropriate.

burden is to show that there is no factual dispute on whether Defendants properly paid the Bellwether claims.  But their brief shows that there are significant disputes factually as to which data elements are relevant to the calculation. Moreover, the facts in evidence show there is significant dispute as to whether the amounts paid are the same as what is required under the Greatest of Three rule.  App. 001701-02 (Fowdur Decl., ¶ 5). [17]

Finally, Defendants' arguments that the Greatest of Three provides for geographic variation in pricing are irrelevant.  In her rebuttal report, Plaintiffs' expert explained that even with geographic limitations, roughly the same proportion of Bellwethers that failed the Greatest of Three in her opening report would still fail the test.  Dkt. 421-1, Ex. D (Fowdur Rebuttal ¶¶ 2-5).

### C.    Defendants Did Not Verify Greatest of Three Compliance for the Bellwethers

---

[17]In any event, Defendants' policy arguments are misguided.  First, Defendants argue that the application of a geographic limitation is necessary to prevent patients having to pay more than they otherwise would owe.  First, the statement ignores that healthcare prices for a patient in Dallas who is a member of one health plan may be different than the healthcare prices for a patient in Dallas who is a member of a different health plan because it is normal for rates paid to be specific to a given provider and a different plan—even in the same location, on the same day, and even with the same professional.  App. 001701 (Fowdur Decl., ¶ 4),  Second, Defendants are wrong in stating that the patient may pay more if an out-of-state's in-network rates are used—in fact, the provider's charge remains the same, and while the *plan* may pay more, the patient is benefitted because the amount the patient can be balanced billed *decreases*.  So the true facts are exactly the opposite of what Defendants say—if a plan's payment obligation is higher during the time the Greatest of Three regulation went into effect, the patient's potential liability due to balance billing is actually lower.  *Id*.  Defendants also argue that the Greatest of Three rule was meant to equalize in- and out-of-network rates. Defs.' Br. at 34.  But their arguments reflect a material misunderstanding of the managed care industry, where out-of-network rates were higher than in-network rates during the years in question.  Providers are willing to accept lower rates as in-network providers because they make an economic judgment that the reduction in compensation is worth the gain in revenue from increased volume from referred plan members. *See* App. 000023-24 (Pape Decl., ¶¶ 4-5).  Finally, Defendants argue that Plaintiffs' position seeks to establish a "single nationwide rate."  Not so. Plaintiffs argue that the text of the regulation requires the Plans to consider their own claims payment data in calculating the prongs of the Greatest of Three rule.  For a geographically limited plan, such as the Defendant entities, this has the effect of establishing a rate that is dominated by the market in which each Defendant operates, and necessarily incorporates any methodology for the calculation of in- and out-of-network rates.  In any event, if Defendants disagree with the health policy behind the Greatest of Three regulation, they should have carried their grievance to the three agencies that adopted it, not this Court.

Defendants maintain that the "Greatest of Three regulation only requires that allowed amounts for out-of-network emergency services must meet a minimum threshold; it does not specify who must do the math to calculate that threshold." Defs.' Br. at 36. Defendants' statement is incorrect and irrelevant. Defendants admit that they—as the plans paying the claims—were responsible for ensuring that the federal law was satisfied, and there is no evidence in the record that any Defendant took any steps to do so. App. 001911; App. 001938. It is also wrong for Defendants to contend that "Plaintiffs have no evidence that either the BCBSTX allowed amount or Defendants' actual payments do not meet the relevant minimum threshold." Defs.' Br. at 36. Plaintiffs' expert conducted those exact calculations and determined nearly every Bellwether Claim failed at least one of three benchmarks. Dkt. 421-1, Ex. A (Fowdur Rep. ¶ 34).

Defendants point to deposition testimony of one witness to argue that BCBSA "policies" and "antitrust" rules prevent them from verifying BCBSTX's compliance with the Greatest of Three regulation. Defs.' Br. at 36. Defendants cite no case law or BCBSA policies to support this argument. (In fact, Defendants admit that home plans are able to ask host plans about the pricing of claims. App. 001738-39.) These statements are merely excuses for the fact that they conducted no analyses to verify compliance. There is no evidence that a Defendant home plan that discusses *its own pricing for an out-of-state claim* with BCBSTX who provided the recommended pricing violates any antitrust laws. Defendants point to no authority preventing them from inquiring as to the basis of their own payment to their own member; they cannot use "antitrust" as an excuse to feign ignorance as to how their own payments were calculated. The record reflects that Defendants did in fact place blind trust in BCBSTX to comply with the Greatest of Three.[18]  *See, e.g.,* App.

---

[18] Defendants also assert no such action plan or penalties have been assessed by the BCBSA with respect to compliance with the Greatest of Three rule. Defs.' Br. at 37. But the BCBSA does not

001774-76 ("Blue Cross Blue Shield of Alabama relied on Texas to perform that and send us the appropriate allowance."); App. 001920; App. 001947-49.

### D.    There are Factual Disputes as to Whether Defendants' Payments Based on Other Methodologies Complied with the Greatest of Three

Defendants also argue that in some instances they paid the amount required by their own internal documents, such as the plan document[19] or member health benefit plan.[20] Defs.' Br. at 37-34.  But Defendants cannot use documents of their own creation (that were kept secret from Plaintiffs) to justify noncompliance with the Greatest of Three.  The result generated from following a BCBSTX payment recommendation, a plan document, or internal policy may be higher or lower than what the Greatest of Three requires. The only way to determine if Defendants paid the greatest of the legally required measures is to do the actual measurement and testing. Defendants say they "adhered to the express terms of the health benefit plans at issue," Defs.' Br. at 38, but they did not verify whether the pricing provided in the plan documents complied with the Greatest of Three.  Meanwhile, Plaintiffs' expert demonstrated that when the actual testing and measurement is conducted, Defendants underpaid.  Dkt. 421-1, Ex. A (Fowdur Rep.).

### E.    Defendants Abused Their Discretion in Paying the Bellwether Claims

Defendants argue that they paid the Bellwether Claims in accordance with plan terms, either using BCBSTX pricing or stated plan methodologies.[21]  Defs.' Br. at 40.  But if Defendants

---

check compliance (*see supra* note 14), and the home plans bury their heads in the sand when it comes to what host plans are doing to comply with the Greatest of Three.

[19] In some cases, Defendants' payments did not even comply with the relevant plan document.  *See* App. 001791 (plan document requiring payment at billed charges but BCBS Alabama paid the BCBSTX recommended amount). Other times, Defendants admit the claim was not paid per the Greatest of Three, but rather according to the plan document. App. 001819-20.

[20] Defendants make the same argument for non-ERISA claims (Defs.' Br. at 39), and Plaintiff's response is largely the same. Defendants are required to pay out-of-network emergency services as calculated under the Greatest of Three rule and have not.

[21] For some Bellwether Claims, Defendants actually lowered the recommended amount from BCBSTX.  *See* App. 001780.

did not evaluate what result would be produced by the Greatest of Three analysis, then Defendants are not only out of compliance with federal law but they also made no attempt to comply. Defendants are ultimately responsible to pay the claims for services provided to their members, and thus it is their obligation to comply with federal law in reimbursing Plaintiffs.  Defendants' failure to monitor their own compliance does not mean they are absolved from liability for their noncompliance.  To the extent Defendants accepted BCBSTX's pricing determinations without even checking to see if the Greatest of Three was satisfied, this is arbitrary and capricious and an abuse of discretion. *See Bryant v. Cmty. Bankshares, Inc.*, 265 F. Supp. 3d 1307, 1324 (M.D. Ala. 2017) (Factors that shed light on whether there was a reasonable basis for the ERISA administrator's decision include "whether the plan interpretation complies with governing regulations."), *aff'd*, 736 F. App'x 841 (11th Cir. 2018); *Hess v. Hartford Life Acc. Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) ("the plain language or structure of the plan or simple common sense will require the court to pronounce an administrator's determination arbitrary and capricious.").

### F.    The Payment for Nearly Every Bellwether Failed One of Three Benchmarks

As discussed in Plaintiffs' response to Defendants' motion to strike Dr. Fowdur's testimony (Dkt. 436), Dr. Fowdur's opinions are not subject to the administrative record "limitation."  Moreover, Dr. Fowdur tested Defendants' Greatest of Three compliance using data relating to services outside of Texas as well as using Defendants' approach involving geographic limitations and her results were the same:  a substantial majority of Bellwether Claims failed at least one of three benchmarks (the average and median allowed rates of BCBSTX, the Greatest of Three, and the UCR rate based on 50th percentile of charges from the FairHealth database).

Defendants take issue with Dr. Fowdur's use of the median of all out-of-network reimbursements as a proxy for the second prong of the Greatest of Three.  Defs.' Br. at 42. Defendants' criticisms are irrelevant and misleading.  Dr. Fowdur analyzed BCBSTX's payments

themselves, and the actual payment amounts, *i.e.* the outcomes of the "methodology," are what must comply with the Greatest of Three regulation.  Moreover, while it is statistically correct that for a given distribution, half the data will be above and half the data will be below the same distribution's median, here, Dr. Fowdur's analysis showed that a substantial majority of the Bellwether Claims had allowed amounts lower than the median, which is indicative of systematic underpayments.  Thus, the distribution of allowed amounts for the Bellwether claims was systematically lower than the distribution of allowed amounts for claims reimbursed according to BCBSTX's out-of-network methodology.  App. 001700-01 (Fowdur Decl., ¶ 3).

Finally, Defendants state that "Fowdur's analysis cannot show damages for 51% of the remaining Bellwether Claims."  Defs.' Br. at 42.  Again, this statement is misleading and incorrect in that it implies Dr. Fowdur only analyzed the Greatest of Three regulation in her underpayment analysis.  In fact, she analyzed two other benchmarks—the average and median allowed rates of BCBSTX (which is relevant because for the majority of the Bellwethers, the allowed amounts were priced by BCBSTX), and the UCR rate based on 50th percentile of charges from the FairHealth database (which is relevant because Texas Department of Insurance has considered FAIR Health charge amounts to be a pivotal benchmark in measuring the adequacy of emergency services in Texas, and some of the Defendants also use it as a benchmark, *see* Dkt. 436 at 9).   Dr. Fowdur determined that out of 178 Bellwether claims, 160 failed at least one of the three benchmarking tests.  App. 001701-02 (Fowdur Decl., ¶ 5).[22]

## V.   GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER PLAINTIFFS' CLAIMS ARE TIMELY

---

[22] Defendants attach a 15-page "Declaration" of Dr. Gaier to their Appendix (Ex. 675, Defs.' App. 00031487) but do not demonstrate the relevance of it in their motion.  (They should not be allowed to do so in reply.)  Dr. Gaier's Declaration is an inappropriate sur-rebuttal report not permitted by the Federal Rules or Scheduling Order.  In addition, all the Declaration does is to highlight the complexity of the issues and the numerous disputed issues of material fact and expert opinion.

Next, Defendants contend that certain Bellwether Claims are time-barred under statutes of limitations and/or contractual limitations in plan documents. Defs.' Br. at 42. This argument only applies to a sliver of Bellwether Claims, however, and Defendants' attempt to chip away at the claims set should be rejected. *Montfort Square Shopping Center, Ltd.*, 2012 WL 2358163, at *6. Genuine issues of material fact exist as to whether Plaintiffs' claims are timely.

### A. None of the Bellwether Claims Is Barred Pursuant to the Texas Statute of Limitations

Defendants argue that several Bellwether Claims and non-ERISA Bellwether Claims are barred by the Texas four-year statute of limitations. Defs.' Br. at 43. While Plaintiffs agree that Texas's four-year statute of limitations governs contract claims and ERISA claims for benefits, Defendants' arguments overlook applicable tolling and relation-back doctrines. Plaintiffs filed the original complaint against BCBSTX on February 20, 2018, and the out-of-state Defendants were added via an amended complaint on February 19, 2019. Federal Rule of Civil Procedure 15(c) allows relation back to the date of the original pleading when "the law that provides the applicable statute of limitations allows relation back." Fed. R. Civ. P. 15(c)(1)(A). The statute of limitations is tolled where plaintiffs sued the original defendant before the statute ran and additional entities after the statute has run, so long as the additional entities were sufficiently connected to the original defendant to be apprised of plaintiff's claims. *See, e.g., Continental S. Lines, Inc. v. Hilland*, 528 S.W.2d 828, 831 (Tex. 1975) (plaintiff who misidentified defendant should have opportunity to prove proper defendant was not misled by mistake). Tolling is appropriate when the business entities have a relationship, and (1) there are two separate, but related, entities with similar trade names; (2) the correct entity had notice of the suit; and (3) the correct entity was not misled or disadvantaged by the mistake. *See Flour Bluff Indep. Sch. Dist. v. Bass*, 133 S.W.3d 272, 274 (Tex. 2004) (per curiam); *Cummings v. HCA*, 799 S.W.2d 403, 406 (Tex. App 1990) ("[A] business

46

relationship must exist between the erroneously named defendant and the correct defendant.").

Plaintiffs first brought suit against BCBSTX on February 20, 2018,[23] nearly a year before amending the complaint to include Defendants.  (Dkt. 1.)  The original Complaint included all of the claims for benefits now asserted against Defendants.  Plaintiffs filed a claims spreadsheet consisting of 290,000 claims for emergency healthcare services that Defendants underpaid. BCBSTX contended that not all claims were its financial responsibility, requiring Plaintiffs to amend their Complaint to include additional Blue plans.  Plaintiffs lacked the ability to properly identify the Defendants to which each of the claims "belonged," however, and could not determine the responsible Blue plan with any accuracy without Defendants' assistance. The parties undertook an arduous claims "matching" process to occur over a period of 120 days, whereby the parties were ordered to "resolve inconsistencies between plaintiffs' and defendants' electronic claim information." (Dkt. 194.)  Defendants faulted Plaintiffs for not identifying the specific Defendant for each claims in Plaintiffs' claims spreadsheet (Dkt. 123, at 4), but ultimately acknowledged that Defendants are the only ones who could reconcile the "unmatched" claims.  (Dkt. 224.)

The bottom line is that, due to the nature of the BlueCard system, the identity of the "home" Blue plan was in many cases unknown to Plaintiffs, and was certainly not known with any certainty prior to Plaintiffs bringing this lawsuit.  App. 000025 (Pape Decl., ¶ 9).  By the Defendants' intentional design, Plaintiffs simply are not privy to information identifying the member's Blue plan or the process by which claims are adjudicated.  Instead, as discussed above, under the BlueCard "rules," Plaintiffs are directed to raise all issues with claim payment with BCBSTX. BCBSTX essentially stands in the shoes of Defendants as their agent to handle claims,

---

[23]Plaintiffs had entered into a series of tolling agreements with BCBSTX because all of Plaintiffs' interactions regarding the underpaid claims were with BCBSTX, and not with Defendants.  App. 001698 (Ex. F, Declaration of S. Crass ("Crass Decl."), ¶ 5).

communicate with providers, and receive appeals.  And even under the BlueCard regime, it took Defendants themselves months to "match" claims in the lawsuit.

Defendants cannot argue that Plaintiffs' compliance with Defendants' own BlueCard procedures and instructions caused the limitations period to run.  Whether some of Plaintiffs' claims can be time-barred despite Plaintiffs' compliance with the procedures is a fact question for trial.  By initiating suit against BCBSTX, Plaintiffs sufficiently put Defendants on notice of their claims.  *See Barnett v. Houston Natural Gas Co.*, 617 S.W.2d 305, 306 (Tex. Civ.—El Paso, 1981) (the critical issue is whether the party claimed to be responsible is in fact put on notice of the claim being made against it).  Accordingly, the Bellwethers are not barred by the statute of limitations.

### B.     There Are Disputed Issues of Fact as to Whether Plaintiffs' Claims Are Barred by Contractual Limitations in Plan Documents

Defendants argue that several ERISA Bellwether Claims and certain non-ERISA Bellwether Claims are untimely under contractual limitation periods contained in benefit plans. Defs.' Br. at 45. Defendants rely on *Harris Methodist* to argue that "where a[n ERISA] plan designates a reasonable, shorter time period . . . that lesser limitations schedule governs."  *See Harris Methodist Fort Worth*, 426 F.3d at 337.  Courts have held that "[r]easonableness … [turns] on a determination of ***whether the contractual limitations period gives the claimant a chance to investigate the claim and exhaust administrative remedies before the time limitation has run***." *See e.g., Ctr. for Restorative Breast Surgery, L.L.C. v. BCBS of Louisiana*, 2016 WL 7468165, at *14 (E.D. La. May 6, 2016) (emphasis added).  Importantly, where the review process prevents participants from bringing ERISA actions within the contractual period, courts may still allow the participants to proceed.  "I]f the administrator's conduct causes a participant to miss the deadline for judicial review, waiver or estoppel may prevent the administrator from invoking the limitations provision as a defense." *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 114 (2013).

Here, Defendants cannot argue the contractual limitation periods in the plan documents[24] were reasonable when they failed to provide Plaintiffs with access to such plan documents, despite Plaintiffs' repeated requests for the plan documents.  *See* App. 000029 (Jordan Decl., ¶ 16).  As noted, Plaintiffs are emergency services providers, and their patients do not come to the emergency room with their plan documents.  Nonetheless, Plaintiffs made substantial efforts to obtain the relevant plan documents and insurance policies prior to filing suit.  *See id.*; App. 001653.  Although Plaintiffs requested these plan documents in the appeal process, Defendants never produced them prior to discovery.  As a result, Plaintiffs did not have the opportunity to discover which claims belonged to which home plan, much less a "chance to investigate the claim and exhaust administrative remedies before the time limitation has run."  *See Ctr. for Restorative Breast Surgery,* 2016 WL 7468165, at 14.  Defendants' conduct made it impossible for Plaintiffs to comply with the filing deadline, and therefore Defendants are prevented from invoking the limitations provision as a defense.  *See Heimeshoff,* 571 U.S. at 114.

## VI.   THERE ARE DISPUTED ISSUES OF FACT AS TO WHETHER HEALTH PLANS EXEMPT FROM ERISA WERE PROPERLY SUED

Next, Defendants argue that some of the claims related to self-funded benefit plans that are exempt from ERISA should be dismissed.  Defs.' Br. at 46.  Defendants contend, without citing any evidentiary support, that "[b]ecause these plans are funded by the governmental or church entities that sponsor them, they are not underwritten or otherwise insured by the Defendants, who serve only as claims administrators for such plans, and there is no contract between Defendants and the members of such plans on whose behalf Plaintiffs purport to sue."  *Id.*  Defendants have

---

[24]*See Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 585 (1st Cir. 1993) ("When interpreting the provisions of an ERISA benefit plan, we use federal substantive law including the 'common-sense canons of contract interpretation.'  Both trust and contract principles apply to interpreting ERISA plans.") (internal citations omitted).

provided no record evidence to support their arguments.  Defendants have the burden of showing the Court that there is an absence of evidence to support Plaintiffs' case.  *Kee*, 247 F.3d at 210.  In any event, Plaintiffs can proceed under an assignment of benefits with respect to these claims just as with the non-ERISA Bellwether Claims.  With respect to the Bellwether Claims that are exempt from ERISA under § 1003(b), Defendants have not met their burden.

## VII.   THERE ARE DISPUTED ISSUES OF FACT AS TO WHETHER DEFENDANTS ARE ERISA FIDUCIARIES WITH RESPECT TO CERTAIN PLANS

In their final effort to chip away at the Bellwether Claims set, Defendants argue certain Defendants are not the "proper Defendants" for a sliver of the ERISA Bellwether Claims.  Defs.' Br. at 47-48.  Defendants set forth a chart that purports to establish that certain plan documents limit the discretion and authority of Defendants to administer and interpret the plan, "often permitting Defendants to perform only ministerial services while the self-funded group retains final authority and discretion."  *Id.* at 49.  However, in the Fifth Circuit, third parties that are not plan administrators are proper parties for such ERISA claims where they exercise "actual control" over the benefits claims process.  *LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs Inc.*, 703 F.3d 835, 844 (5th Cir. 2013); *see also Johnson v. United Healthcare Ins. Co.*, No. 4:18-cv-00591, 2019 WL 5901235, at *3 (E.D. Tex. July 26, 2019) ("An independent review organization is not immune from suit under ERISA . . . simply because it is not the named plan administrator.").  Here, the evidence demonstrates that Defendants exercised "actual control" over the benefits claim process.  *See, e.g.,* App. 001744, App. 001745.  A fact issue exists as to whether Defendants had discretionary authority over the plans at issue.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that Defendants' Renewed Motion for Partial Summary Judgment be denied.

Respectfully submitted this 6th of October, 2023.

**KING & SPALDING LLP**

*/s/ James W. Boswell*
James W. Boswell
Georgia Bar No. 069838
Admitted *pro hac vice*
Jennifer S. Lewin
Georgia Bar No. 397958
Admitted *pro hac vice*
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309-3521
(404) 572-4600 (telephone)
(404) 572-5100 (facsimile)
jboswell@kslaw.com
jlewin@kslaw.com


WINSTEAD PC
Toby M. Galloway
Texas Bar No. 00790733
300 Throckmorton Street, Suite 1700
Fort Worth, TX 76102
(817) 420-8262 (telephone)
(817) 420-8201 (facsimile)
tgalloway@winstead.com


*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 6, 2023, I electronically filed Plaintiffs' Opposition to Defendants' Renewed Motion for Partial Summary Judgment as to all the Bellwether Claims using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

*/s/ James W. Boswell*
James W. Boswell
