UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ANGELINA EMERGENCY MEDICINE ASSOCIATES P.A., et al., | § § § § | |
| *Plaintiffs*, | § § § | |
| v. | § § | Civil Action No. 3:18-CV-0425-X |
| HEALTH CARE SERVICE CORPORATION, et al., | § § § § | |
| *Defendants*. | § | |

**MEMORANDUM OPINION AND ORDER**
**GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Mary Shelley's *Frankenstein* tells a story of Victor Frankenstein grieving his mother's death and discovering a way to create human life. As a result, he created a large, brooding, living, breathing, sentient, humanoid creature. But when Victor looked upon the creature's face, he did not see the beauty of life. He saw a monster. *His* monster. And his monster would later go on to wreak havoc, killing those whom Victor loved.

This case is the legal version of Frankenstein's Monster. In 2018—a year before the undersigned became a judge—49 physician associations brought an 11-count complaint against Blue Cross Blue Shield, arguing it had underpaid 250,000 claims.[1] It has grown larger since, broadening this legal monster to over fifty

---

[1] Doc. 1 (original complaint) ¶ 13. As the parties note, the operative complaint in this dispute is now the second amended complaint. *See* Doc. 423 at 1 n.1.

physician associations suing around fifty defendants.[2]   At the motion-to-dismiss stage, the Court lopped off Counts III–VII of the operative complaint.[3]   The defendants now seek to wound Frankenstein's Monster by moving to dismiss the 182 bellwether claims[4] set for trial (Doc. 423) and strike certain expert testimony, (Docs. 417, 419).   After reviewing the filings, and the law, the Court **GRANTS** the defendants' Motion for Partial Summary Judgment as to the bellwether claims and **FINDS AS MOOT** the motions to strike expert testimony.

But the Court is well aware that the demise of the bellwethers doesn't mean the whole case is dead yet.[5]

## I. Background

The defendants are members of the Blue Cross Blue Shield Association ("BCBSA").   BCBSA is comprised of thirty-three independent and locally operated Blue Cross Blue Shield Plans ("Blue Plans").   These thirty-three independent Blue Plans are each licensed to use BlueCross BlueShield Trademarks within their

---

[2] Doc. 55 (second amended complaint).

[3] *Angelina Emergency Med. Assocs. PA v. Health Care Serv. Corp.*, 506 F. Supp. 3d 425, 428 (N.D. Tex. 2020) (Starr, J.) (granting in part the defendants' motion to dismiss).

[4] It is somewhat unclear to the Court the precise number of bellwether claims the defendants are seeking to dismiss.   Throughout their motion, the defendants state that there are 158 bellwether claims at issue.   *See e.g.,* Doc. 424 at 1 n.2. But in the defendants' chart, defendants seek dismissal of 182 bellwether claims.   *See* Doc. 435-2.   Perhaps the reason for this discrepancy, 158 versus 182 bellwether claims, is because many parties have dropped out of this case while the Court was considering this motion, response, reply, and sur-reply.   *See* Docs. 444, 451, 456.   Nevertheless, the Court analyzed all 182 bellwether claims.   To the extent this memorandum opinion and order resolves a bellwether claim on the merits featuring a dismissed party, that party should file a motion for reconsideration.   That motion should briefly explain (1) where in the docket the party was dismissed, (2) identify the specific bellwether claim a dismissed party seeks for this court to reconsider, and (3) where, specifically, in this memorandum opinion the court examined the merits of that bellwether claim.   Only one motion for reconsideration per side should be filed.

[5] *See* Jones, T., & Gilliam, T. (1975). *Monty Python and the Holy Grail*. Cinema 5 Distributing (relevant clip at https://www.youtube.com/watch?v=EfOW9QrLs0o).

specific, designated service area.  These service areas are geographically based, typically a state or a portion of a state.  Generally speaking, the thirty-three independent Blue Plans are prohibited from contracting with providers outside of their geographically based service areas.

Sometimes members need—or rather, obtain—health care services outside of a Blue Plan's geographically limited service area.  When this occurs, the health care provider who administered services to the member submits a claim to the local Blue Plan (the "Host Plan").  This out-of-network submission process to the local Host Plan is part of the BlueCard program.

The out-of-network submission process also includes a claim-shifting component.  For example, when a health care provider submits a claim for non-contracted health care services for an out-of-state Blue Plan member to the Host Plan, the Host Plan reviews the claim and sends it to the member's Home Plan.  In addition to sending the claim, the Host Plan sends the proposed amount for the member's out-of-network health care services to the Home Plan.  The Home Plan reviews the claim's information, processes the claim pursuant to the terms of the member's insurance policy, and calculates the amount the Home Plan must pay.

In 2018, approximately half-a-hundred physicians associations sued Blue Cross Blue Shield of Texas arguing that Blue Cross Blue Shield underpaid 250,000 medical claims.  Nearly a year later, plaintiffs filed the operative complaint in this case, their second amended complaint, which now included around fifty defendants. In December 2020, the Court dismissed Counts III, IV, V, VI, and VII of plaintiff's

complaint. After dismissal, only Counts II, III, VIII, and IX of plaintiffs' complaint remained.[6] In these counts, plaintiffs seek to recover benefits under individualized health benefit plans. For the sake of judicial economy, the parties agreed to deem a small subset of these claims, known as "bellwether claims," as a representative sample of all claims in this case.

The defendants now move for partial summary judgment on 182 "bellwether" claims. While each of these 182 bellwether claims contains particular, individualized, and unique facts concerning out-of-network health care services received by a patient, there are also a subset of general facts common among the 182 bellwether claims. The plaintiffs are "physician associations" comprised of various, unidentified members. Some members of these physician groups purportedly staff emergency rooms throughout Texas. When a patient arrives at one of these medical facilities possibly staffed by one member of the plaintiff physician associations, the patient fills out a series of forms provided by the medical facility. Relevant here, one of these forms is an "assignment of benefits" form or contains an assignment-of-benefits clause. As a preview of the upcoming resolution of this motion, these assignment-of-benefits forms, which vary based on the specific bellwether claim at issue, are key in determining whether the plaintiffs have standing to sue the defendants in this case.

In any event, after signing all relevant intake forms, patients receive health care services by potentially one of the physician members in one of the plaintiffs'

---

[6] Claims VIII and IX of plaintiffs' complaint are claims for attorney's fees under ERISA and Texas law. These claims are derivative of plaintiffs remaining substantive claims. Doc. 136 at 53.

physician associations.   That health care facility then submits a claim for reimbursement to BlueCross BlueShield Texas (the services are provided in Texas) which then transmits the claim information and allotted (pricing) amount to one of the defendants, who then administers the patients' health benefit plan.  The claim is then sent back to BlueCross BlueShield Texas for processing.  The price of the claim, or alternatively, the pricing of the out-of-network health care services received is the substantive, merits issue in this motion.

## II. Legal Standard

Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the non-moving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[7]  "A fact is material if it 'might affect the outcome of the suit'" and "[a] factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[8]  Courts "resolve factual controversies in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[9]

---

[7] FED. R. CIV. P. 56(a).

[8] *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019) (alteration in original) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[9] *Antoine v. First Student, Inc.,* 713 F.3d 824, 830 (5th Cir. 2013) (cleaned up).

## III. Analysis

The defendants' omnibus partial motion for summary judgment as to the bellwether claims contains six arguments with an appendix spanning 701 exhibits and 32,758 pages. Here's the quick overview of those arguments.

First, the defendants argue that the plaintiffs lack standing because they lack valid and enforceable assignments.[10] Second, the defendants argue that the plaintiffs failed to exhaust their administrative remedies under the patients' health benefit plans before bringing suit in this Court.[11] Third, the defendants argue the plaintiffs' claims are now time-barred because they are untimely.[12] Fourth, the defendants argue that the plaintiffs' ERISA claims fail because the defendants are not ERISA fiduciaries.[13] Fifth, the defendants argue that they have properly paid the bellwether claims.[14] Sixth, the defendants argue that the plaintiffs sued the wrong party for a small subset of the bellwether claims (the non-ERISA claims).[15]

The defendants' first (subject-matter jurisdiction), second (exhaustion of administrative remedies), and third (time-barred) arguments are dispositive.

### A. Subject-Matter Jurisdiction

The parties dispute whether this Court has subject-matter jurisdiction over the ERISA claims. First, the defendants note that the plaintiffs must possess "valid

---

[10] Doc. 424 at 21–31.

[11] *Id.* at 32–37.

[12] *Id.* at 51–55.

[13] *Id.* at 56–58.

[14] *Id.* at 37–51.

[15] *Id.* at 55–56.

and enforceable" assignment of benefits for this Court to have subject-matter jurisdiction over the plaintiffs' ERISA claims.[16]  Second, the defendants argue that each of the plaintiffs lack "valid and enforceable" assignments in at least one of the following four ways: (1) some patients' health benefit plans contain valid and enforceable *anti*-assignment clauses;[17] some patients' health benefit plans do not contain valid assignments because either (2) some of the plaintiffs are not the named assignees in patients' health benefit plans[18] or (3) some patient health benefit plans contain only putative assignments;[19] and (4) some assignments are not accompanied by a written health benefit plan.[20]

In response, the plaintiffs contest each of these four categories.[21]  First, the plaintiffs argue that the defendants have waived their ability to rely on the *anti*-assignment clauses.[22]  Second, the plaintiffs argue that those health benefit plans purportedly not naming the plaintiffs as intended assignees do in fact name the plaintiffs as intended assignees.[23]  Third, the plaintiffs argue that those "putative"

---

[16] *Id.* at 21–24.

[17] *Id.* at 24–26.

[18] *Id.* at 27–30.

[19] *Id.* at 30–31.

[20] *Id.* at 26.

[21] Doc. 442 at 26–27.

[22] *Id.* at 34–38.

[23] *Id.* at 29–32.

assignments still confer standing.[24]   Fourth, the plaintiffs argue that those assignments lacking a written record still confer standing.[25]

The Court agrees with the defendants.

### 1. Subject-Matter Jurisdiction of ERISA Claims Generally

As a general matter, "ERISA does not supply the provider with a basis for bringing its claim directly against the appellants; instead, the provider's standing to bring this lawsuit must be derived from the beneficiary and it is subject to any restrictions contained in the plan."[26]  "An assignment is a manifestation to another person by the owner of a right indicating his intention to transfer, without further action or manifestation of intention, his right to such other person or third person."[27] "Once a valid assignment is made, 'the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance.'"[28]  "To decide whether [a party] became an assignee" for purposes of ERISA, a court "examine[s] and consider[s] the entire writing and give[s] effect to all provisions such that none are rendered meaningless."[29]  Specifically, "[c]ontractual terms receive their ordinary and plain meaning unless the contract indicates the

---

[24] *Id.* at 32–34.

[25] *Id.* at 27–29.

[26] *Dialysis Newco, Inc. v. Cmty. Health Sys. Group Health Plan*, 938 F.3d 246, 250 (5th Cir. 2019).

[27] *Harris Methodist Fort Worth v. Sales Support Servs. Inc. Emp. Health Care Plan*, 426 F.3d 330, 334 (5th Cir. 2005) (cleaned up).

[28] *Id.* (quoting Restatement (Second) of Contracts § 317(1) (1981)).

[29] *Id.*

parties intended to give the terms a technical meaning."[30]  Additionally, "[w]here a contract is written so that it can be given a definite or certain legal meaning, it is not ambiguous."[31]   But "where a contract is subject to two or more reasonable interpretations, it is ambiguous and extrinsic evidence may be considered."[32]

"In addition, ERISA requires that the [summary plan description] be 'written in a manner calculated to be understood by the average plan participant, and . . . be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.'"[33]  Indeed, "the very purpose of having a summary plan description of the policy is to enable the average participant in the plan to understand readily the general features of the policy, precisely so that the average participant need *not* become expert in each and every one of the requirements, provisos, conditions, and qualifications of the policy and its legal terminology."[34]

So if any of the plaintiffs' 182 purported assignments fail for any of the defendants' argued reasons, this Court lacks jurisdiction to hear that bellwether claim.  Also, the plaintiffs assert jurisdiction in this Court and thus have "the burden of proving it exists"—despite the fact that they are not the movants.[35]  This means

---

[30] *Id.*

[31] *Id.* (cleaned up).

[32] *Id.*

[33] *Id.* (quoting 29 U.S.C. § 1022)).

[34] *Hansen v. Cont'l Ins. Co.,* 940 F.2d 971, 981 (5th Cir. 1991) (emphasis in original), *abrogated on other grounds by Perez v. Bruister*, 823 F.3d 250 (5th Cir. 2016).

[35] *Peoples Nat'l Bank v. Off. of Comptroller of Currency of U.S.*, 362 F.3d 333, 336 (5th Cir. 2004).

that the Court will dismiss any bellwether claims where the plaintiffs have not carried their initial burden in proving subject-matter jurisdiction exists.

## 2. Are Plaintiffs Named Assignees?

The defendants' assert that many of the assignments purporting to confer subject-matter jurisdiction fail because certain patients' health benefit plans do not name the plaintiffs as assignees.[36]  More specifically, the defendants argue that certain health benefit plans assign the patient's benefits to a different entity such as a "health care facility" and not to the plaintiffs who are physician associations.[37]  In response, the plaintiffs argue that their physician associations fall within one of the various catch-all provisions such as "health care providers."[38]  The Court agrees with the defendants.

For this Court to have subject-matter jurisdiction over the ERISA claims, the plaintiffs must be the named assignees of a patient's health benefit plan.[39]  Take, for example, an analogous case from this Court: *Innova Hospital San Antonio LP and Victory Medical Center Houston, L.P., v. Health Care Services Corp.*  In *Innova*, two hospitals in Texas sued forty out-of-state insurance conglomerates seeking reimbursement for products and services offered by Blue Cross Blue Shield.[40]  There,

---

[36] Doc. 424 at 27–30.

[37] *Id.* at 27–30.

[38] Doc. 442 at 30–32.

[39] *See Harris Methodist*, 426 F.3d at 334 (defining an assignment as "a manifestation to *another person*" (emphasis added)); *see also Innova Hosp. San Antonio LP v. Health Care Serv. Corp.*, No. 3:12-CV-01607, 2019 WL 13177034, at *4 (N.D. Tex. Oct. 2, 2019) (O'Connor, J.) (holding that plaintiff lacked derivative standing under ERISA because "the assignment of benefits unambiguously assign[ed] the patient's rights to" a different company).

[40] *Innova*, 2019 WL 13177034, at *1.

10

the co-plaintiff Victory Medical Center claimed to be the named assignee based on the health plan assigning the patient's benefits to an incredibly similar name—"Victory Parent Company LLC d/b/a 'Victory Medical Center.'"[41]   This Court disagreed.[42]   Instead, this Court held that the health plan assigning the plaintiff's rights to "Victory Parent Company LLC d/b/a 'Victory Medical Center'" assigned rights only to the expressly listed parent company and not the "separate legal entit[y]" of that company's DBA name because a DBA name "has no legal existence."[43] In short, an assignment naming one entity cannot confer jurisdiction onto a "separate legal entit[y]."[44]

Here, while the text of each of the 182 bellwether claims varies, most—if not all—of the catch-all provisions used in the patients' health benefit plans assign the right to pursue legal relief to an entity different than the plaintiffs.   For example, bellwether claim DW4 assigns its rights to the "Facility[] and Facility-based physicians."[45]   The plaintiffs, who are physician associations, are neither the operating "facility" nor a "facility-based physician."   In this context, the "facility" is the hospital or other place where DW4 received health care services.   And the "facility-based physician" would be the physician working at the place where DW4 received health care services.

---

[41] *Id.* at *3 (quoting the plaintiff's health plan).

[42] *Id.* at *4.

[43] *Id.*

[44] *Id.*

[45] Doc. 424-1 at 22.

The plaintiffs argue that they fall under a catch-all provision such as a "facility-based physician" because one member in its association may have been a "facility-based physician" at the time one of the 182 patients received medical care. The plaintiffs' argument fails for two reasons.

First, as an evidentiary matter, the plaintiffs have not proffered any evidence that a member of their association was a "facility-based physician" at the time a patient received their health care services. Sure, the plaintiffs generally state in their responsive brief that "[w]hen patients assign their benefits to physicians who provide them care *and those physicians are part of a physician group*, **as Plaintiffs are**, the physician group falls within the scope of that assignment."[46] But the plaintiffs have not provided evidence as to *who* those physicians might be. And "at the summary judgment stage, [the party invoking federal-court jurisdiction] must set forth by affidavit or other evidence specific facts to survive a motion for summary judgment."[47] The plaintiffs have not provided the evidence of which of its members in one of its associations qualifies as a "facility-based physician." And this Court will not assume it has subject-matter jurisdiction at the summary-judgment stage.

But even if the plaintiffs had provided even a shred of evidence showing that one of its members was a physician for one of the bellwether patients to fall under the catch-all language, they still wouldn't belong in a federal court. Again, the plaintiffs are physician associations whose individual members may have provided

---

[46] Doc. 442 at 32 (emphasis added).

[47] *Legacy Cmty. Health Services, Inc. v. Smith*, 881 F.3d 358, 366 (5th Cir. 2018), *as revised* (Feb. 1, 2018).

health care services in various emergency rooms in Texas.  But in Texas, an association and its members are distinct legal entities.  By statute, "a professional association has the same powers, privileges, duties, restrictions, and liabilities as a for-profit corporation."[48]

Speaking of corporations, "[u]nder Texas law, a corporation is an entity separate from its shareholders."[49]  To highlight the point that an association is not its individual members, it's "[a] bedrock principle of corporate law . . . that an individual can incorporate a business and thereby normally shield himself from personal liability for the corporation's contractual obligations."[50]  True, while this Court is not opining on the underlying liability between one of the physician associations and one of its members, the point stands that Texas law considers an association and its members distinct legal entities.  As a result, even assuming one of the association's members was a "facility-based physician" at the time DW4 received care, the facility-based physician himself would have standing to sue, not the "separate legal entity" that is his association.  To hold otherwise, that one member-physician establishes standing for his entire association, would effectively blend an injury to a member and its "separate legal entity."

In short, because an association and its members are distinct legal entities under Texas law, the Court does not have subject-matter jurisdiction here unless the

---

[48] Tex. Bus. Orgs. Code § 2.108.

[49] *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997).

[50] *Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006).

health benefit plan expressly assigns the right to legal relief to one of the plaintiff associations.

The Court has reviewed each of the 182 bellwether claims and dismisses those claims where one of the plaintiffs is not expressly named in the assignment: DBW1, DBW3, DBW4, DBW5, DBW6, DBW8, DBW9, DBW10, DBW11, DBW13, DBW14, DBW15, DBW16, DBW17, DBW18, DBW19, DBW20, DBW22, DBW23, DBW24, DBW25, DBW28, DBW31, DBW32, DBW34, DBW35, DBW36, DBW37, DBW38, DBW39, DBW40, DBW41, DBW43, DBW44, DBW45, DBW46, DBW47, DBW48, DBW49, DBW50, DBW51/PBW55, DBW52, DBW53, DBW55, DBW56, DBW57, DBW58, DBW65, DBW66, DBW70, DBW73, DBW74, DBW75, DBW78, DBW79, DBW80, DBW82, DBW83, DBW85, DBW86, DBW87, DBW88, DBW89, DBW91, DBW92, DBW93, DBW94, DBW95, DBW96, DBW97, DBW98, DBW99, DBW100, PBW2, PBW3, PBW4, PBW5, PBW6, PBW7, PBW8, PBW9, PBW10, PBW11, PBW13, PBW14, PBW15, PBW16, PBW17, PBW18, PBW19, PBW20, PBW21, PBW22, PBW24, PBW25, PBW26, PBWW30, PBW31, PBW32, PBW33, PBW34, PBW35, PBW37, PBW41, PBW43, PBW44, PBW46, PBW47, PBW48, PBW49, PBW50, PBW52, PBW53, PBW55/DBW51, PBW56, PBW57, PBW65, PBW70, PBW71, PBW72, PBW73, PBW74, PBW75, PBW76, PBW80, PBW81, PBW82, PBW83, PBW84, PBW85, PBW86, PBW88, PBW89, PBW90, PBW91, PBW92, PBW93, PBW94, PBW95, PBW96, and PBW99.[51]

---

[51] As mentioned earlier, the plaintiffs have submitted no evidence that a member of one of its associations worked at any of the health care facilities at the time a bellwether patient received care. Therefore, the Court cannot hold that the plaintiffs fall under any of the health benefit plans' catch-all provisions because the Court is lacking documentary evidence that a member of one of the plaintiff

### 3. Putative Assignments

The defendants argue that many of the purported assignments fail because those health benefit plans designate to another entity the right to seek further administrative relief under the plan as an "authorized representative" instead of assigning away the right to seek legal relief,[52] which, again, is required for subject-matter jurisdiction.  In response, the plaintiffs concede that, while some patient health benefit plans assign merely the right to pursue administrative relief as an "authorized representative" of the patient,[53] many of the patient health benefit plans also include additional language expressly assigning away the right to pursue judicial relief.[54]  The Court agrees with the plaintiffs to an extent.

Health benefit plans can designate away rights to a third party distinct from an assignment to pursue legal relief.[55]  For example, the Fifth Circuit has highlighted the distinction between a health plan designating away a "direct-payment authorization," which does not confer jurisdiction, and a full "assignment."[56]  In the Fifth Circuit's words:

> A direct-payment authorization means only that the beneficiary tells the administrator to forward the checks owed to him or her on to the provider instead.  An assignment of benefits is more than that.  An

---

associations worked at a health care facility at the relevant time.  And because the plaintiffs have the burden to prove they belong in this Court, the Court cannot merely assume that one member of the plaintiffs' association provided health care services at the relevant facility at the relative time.

[52] Doc. 424 at 30–31.

[53] Doc. 442 at 33 ("Even if the Court were to accept the assignee-authorized representative distinction here, *it would only apply to* [*a*] small *subset of the Bellwether Claims*." (emphasis added)).

[54] *Id.* at 32–34.

[55] *See Dialysis Newco, Inc.*, 938 F.3d at 254.

[56] *See id.*

assignment means that the provider has stepped into the metaphorical shoes of the beneficiary and is capable of exercising all the legal rights enjoyed by the beneficiary under the plan, to include suing the plan and/or its administrator over disputes that might arise in the plan's interpretation.[57]

Here, the defendants argue that many of these purported assignments fall short of assigning away the right to pursue legal relief.[58]  Of these contested health benefit plans, the plaintiffs contest only bellwether PBW94 in their brief.  While the defendants are correct that PBW94's health benefit plan contains authorized-representative language, such as PBW94 agreeing to "appoint ETMC, and any agent acting on its behalf, as [PBW94's] authorized representative to pursue any claims, penalties, and administrative . . . remedies," PBW94's health benefit plan also expressly states that its authorized representative also has the power "to pursue any . . . legal remedies on [PB94's] behalf."[59]  The language in PBW94's health benefit plan expressly confers the assignment of rights and not merely the right for an entity to be an "authorized representative."

But the question remains as to *whom* that assignment has been made.  PBW94 assigns the right to legal relief to "ETMC."  the plaintiffs have proffered no evidence as to ETMC's connection with this case.  ETMC does not appear to be a party in this case.  For this reason, while PBW94 does assign away the right to pursue legal remedies to ETMC, there is no evidence connecting ETMC to this case.  So the Court would lack subject-matter jurisdiction over PBW94.

---

[57] *Id.*

[58] *See* Doc. 435-4 (chart outlining invalid assignments).

[59] *See* Doc. 434-16 at 284; Defs.' App. at 30,689.

The Court has reviewed the 182 bellwether claims and dismisses the claims that solely delegate away rights other than the right to pursue legal relief, such as the right to be an "authorized representative" on behalf of the patient: DBW3, DBW4, DBW8, DBW9, DBW10, DBW13, DBW16, DBW17, DBW18, DBW38, DBW40, DBW53, DBW55, DBW57, DBW58, DBW79, DBW99, PBW2, PBW5, PBW6, PBW8, PBW11, PBW18, PBW34, PBW43, PBW44, PBW52, PBW53, PBW56, PBW57, PBW72, PBW73, and PBW78.[60]

### 4. Existence of Assignments

The defendants argue that the Court lacks jurisdiction to hear disputes involving 29 bellwether claims that lack a physical, written health plan.[61]   In response, the plaintiffs argue that a physical, written health plan is not required to establish jurisdiction because the plaintiffs can prove assignment through testimonial evidence.[62]  The Court agrees with neither party.

As to the existence of valid assignments for purported assignments lacking a written health benefit plan, the Court finds the opinion in *Encompass Office Solutions, Inc. v. Connecticut General Life Insurance Co.* persuasive.[63]  In *Encompass*, the Court confronted an identical issue—the assignment of patients' health benefit

---

[60] In this and the subsequent lists of claims the Court is dismissing, the Court made the list exhaustive rather than just the claims that remained live until this section so the Fifth Circuit knows the Court's alternate and independent grounds for dismissal of a claim that is subject to dismissal on more than one basis.

[61] Doc. 424 at 26.

[62] Doc. 442 at 27–29.

[63] No. 3:11-CV-02487, 2017 WL 3268034, at *10 (N.D. Tex. July 31, 2017) (Lindsay, J.) (holding that the plaintiffs raised a fact dispute as to assignment of health plans).

plans at the summary-judgment stage of litigation.[64]  Notably, *Encompass* held that

"an assignment of a claim for benefits need not be in writing to be effective unless

required by contract or statute."[65]  Because of this, *Encompass* held that the following

witness deposition testimony was, as an evidentiary matter, enough to survive an

opposing motion for summary judgment as to whether there was a valid assignment:

> We standardly have an assignment of benefits signed by every patient.
> Everyone has signed one.  It is nice to have the assignment of benefits
> signed.  So they understand unequivocally that there is a third party
> involved in this called Encompass Office Solutions.  It is always possible
> that those assignments could have ended up, A, in the doctor's file, B, in
> anesthesia's paperwork because we were doing all of their paperwork,
> or C, could have ended up with the pre-op and postoperative notes that
> are in our filing system.  But we are confident that they signed them.
> Now, can I find them all?  Obviously not, but they were all signed one
> way or another.[66]

Here, the plaintiffs lack written assignments for 29 of their 182 bellwether claims.

And in an attempt to avoid summary judgment on the bellwether claims in which

there is no written assignment, the plaintiffs have provided the declaration of Paul

Jordan, the Director of Revenue Assurance with SCP Health.[67]  Relevant here,

Jordan states that it is "standard practice" at the hospitals where one of the plaintiffs'

member physicians works to "routinely receive[] executed assignments of benefits

---

[64] *Id.* at *6–10.

[65] *Id.* at *10.  It does not appear that the Fifth Circuit has held that a plaintiff can prove the existence of a valid ERISA assignment by oral evidence alone, nor does it appear that the Fifth Circuit has examined the issue directly.  At best, in passing, the Fifth Circuit has stated "oral assurances have low probative value in ERISA cases."  *Mello v. Sara Lee Corp.*, 431 F.3d 440, 447 n.6 (5th Cir. 2005).  Nevertheless, without much more guidance from the Fifth Circuit, the Court will follow what was previously held in this Court—that is, that it is possible that a plaintiff can prove the existence of a valid ERISA assignment by oral evidence alone.

[66] *Id.* at 9 (cleaned up).

[67] *See* Doc. 443-3 at 2–15; Plaintiffs' App. at 27–40.

from patients."[68]  In following *Encompass*, Jordan's declaration stating that hospitals routinely administer health benefit forms to patients creates a fact dispute as to the existence of assignments where he works, SCP Health.  But Jordan's declaration does not create a fact dispute as to the existence of assignments at other hospitals.  The plaintiffs comprise nearly half-a-hundred physicians associations.  Jordan lacks personal knowledge as to the routines at other medical facilities besides his own.  And under the Federal Rules of Civil Procedure, the Court cannot consider portions of a "declaration used to support or oppose a motion" for summary judgment unless it is "made on personal knowledge."[69]

The next question for the Court is to ask if the plaintiffs have carried their burden in identifying which of these 29 bellwether claims lacking a written health benefit plan involve health care services performed at SCP Health.  They haven't. Again, the plaintiffs assert jurisdiction in this Court, and they have "the burden of proving it exists."[70]  Yet the plaintiffs have not directed the Court as to which of the 29 bellwether claims at issue were performed at SCP Health.  Not a single one.[71]  As the Fifth Circuit instructs, a "perfunctory and conclusional assertation that a particular affidavit creates" a fact dispute "normally will not suffice" because "Judges are not pigs, hunting for truffles buried in *briefs*" or worse—a 182-claim, 725-exhibit,

---

[68] Doc. 443-3 at 3 ¶ 8; App. at 28 at ¶ 8.

[69] FED. R. CIV. P. 56 (c)(4).

[70] *Peoples Nat'l Bank*, 362 F.3d at 336.

[71] Doc. 442 at 27–29 (Plaintiffs' Response) (arguing that oral assignments can confer standing to the plaintiffs); Doc. 449-1 (Plaintiffs' Sur-Reply) (containing no argument as to oral assignments and standing).

34,708-page record.[72]  In short, the plaintiffs have not carried their burden in proving that Jordan's declaration creates a fact dispute concerning the assignment of 29 bellwether claims lacking a written assignment for health services performed at either SCP Health or elsewhere.

### 5. Waiver of Anti-Assignment Clauses

The defendants argue that this Court lacks subject-matter jurisdiction over a significant majority of the bellwether claims in this case because the patients' health benefit plans contain anti-assignment clauses.[73]  In response, the plaintiffs argue that the defendants have waived their ability to assert these anti-assignment clauses.[74]  The Court agrees with the defendants.

As it pertains to those health benefit plans containing anti-assignment clauses, "[i]f the provider lacks standing to bring the lawsuit due to a valid and enforceable anti-assignment clause, then federal courts lack jurisdiction to hear the case."[75]  Although a health benefit plan can include a jurisdiction-stripping, anti-assignment clause, a party can be judicially estopped from asserting an anti-assignment clause in the ERISA context.[76]  In the Fifth Circuit, "[t]o establish an ERISA-estoppel claim, the plaintiff must establish: (1) a material misrepresentation; (2) reasonable and

---

[72] *See de la O v. Housing Auth. of City of El Paso, Tex.*, 417 F.3d 495, 501 (5th Cir. 2005) (emphasis added) (noting that a "perfunctory and conclusional assertion that a particular affidavit creates" a fact issue "normally will not suffice")

[73] Doc. 424 at 24–26.

[74] Doc. 442 at 34–38.

[75] *Dialysis Newco, Inc.*, 938 F.3d at 250.

[76] *Mello*, 431 F.3d at 444 ; *see also Grand Parkway Surgery Ctr., LLC v. Health Care Serv. Corp.*, No. 4:15-CV-0297, 2015 WL 3756492, at *2 (S.D. Tex. June 16, 2015) ("In certain circumstances, however, the defendant may have waived or be estopped to assert the anti-assignment provision.").

detrimental reliance upon the representation; and (3) extraordinary circumstances."[77]

In determining the ERISA-estoppel issue at the summary-judgment stage, many district courts have held that ERISA waiver constitutes a fact dispute resolvable only after trial; this is because district courts have held there are genuine issues of material fact related to the "reasonable" reliance prong.[78]

But this Court takes direction from the Fifth Circuit. And the Fifth Circuit has held that, as a matter of law, a party asserting an ERISA-estoppel claim cannot "reasonably rel[y]"[79] when the reliance runs contrary to the plain meaning of the anti-assignment clause.[80]

To this end, the Fifth Circuit's *Mello v. Sara Lee Corp.* decision warrants additional discussion. The plaintiffs cite *Hermann Hospital v. MEBA Medical and Benefits Plan* for the origin of the ERISA-estoppel theory.[81] Indeed, at base, *Hermann* held that a party can be estopped from relying on an anti-assignment clause.[82] But

---

[77] *Mello*, 431 F.3d at 444–45.

[78] *Jones v. Int'l Bus. Machs. Corp.*, No. 1:19-CV-0251, 2020 WL 6729088, at *6 (W.D. Tex. Nov. 15, 2020) (recommending that the court cannot determine ERISA estoppel at the summary-judgment stage), *report and recommendation adopted*, No. 1:19-CV-0251, 2020 WL 8361930 (W.D. Tex. Dec. 29, 2020); *Malbrough v. Kanawha Ins. Co.*, 943 F. Supp. 2d 684, 696 (W.D. La. 2013) (holding that the court cannot determine ERISA estoppel at the summary-judgment stage); *Bunner v. Dearborn Nat'l Life Ins. Co.*, No. 4:18-CV-1820, 2021 WL 2119488 (S.D. Tex. May 25, 2021), *aff'd*, 37 F.4th 267 (5th Cir. 2022) (determining ERISA-estoppel theory after trial).

[79] *Mello*, 431 F.3d at 445.

[80] *Id.* at 447 (citing *Sprague v. GMC*, 133 F.3d 388, 404 (6th Cir. 1998)); *see also High v. E-Sys. Inc.*, 459 F.3d 573, 580 (5th Cir. 2006); *Cell Sci. Sys. Corp. v. La. Health Serv.*, 804 F. App'x 260, 266 (5th Cir. 2020) (per curiam).

[81] *Hermann Hosp. v. MEBA Med. & Benefits Plan*, 959 F.2d 569, 574 (5th Cir. 1992), *overruled by Access Mediquip, L.L.C. v. UnitedHealthcare Ins. Co.*, 698 F.3d 229 (5th Cir. 2012).

[82] *Id.*

the Fifth Circuit did not expressly adopt the ERISA-estoppel theory until 20 years after *Hermann* in *Mello*.[83]  In expressly adopting the ERISA-estoppel theory, the *Mello* court held, on appeal at the summary-judgment stage, that the plaintiff could not succeed in proving ERISA-estoppel theory because the plaintiff could not satisfy the ERISA-estoppel's "reasonable reliance" prong when the reliance runs counter to the anti-assignment clause's plain language.[84]  And, to this point, the Fifth Circuit has cited *Mello*'s holding favorably as recently as three years ago.[85]

Here, although every health benefit plan may differ in its language, many of the anti-assignment clauses are unambiguous.  For instance, DBW99's health benefit plan plainly states that the plan's benefits "cannot be transferred":

> Benefits for covered services under this group health plan are for your personal benefit and *cannot be transferred or assigned* to anyone else without our consent. *You are prohibited from assigning* any claim or cause of action arising out of or relating to this group health plan.[86]

The plaintiffs cannot reasonably rely in in defiance of this unambiguous language.[87]

Accordingly, the Court dismisses the following bellwether claims because they contain a valid anti-assignment clause: DBW1, DBW2, DBW3, DBW4, DBW5, DBW6, DBW11, DBW12, DBW14, DBW17, DBW18, DBW19, DBW20, DBW21, DBW24,

---

[83] *Mello*, 431 F.3d at 444 ("This circuit has yet to explicitly adopt ERISA-estoppel as a cognizable legal theory. . . .  We now join other circuits in explicitly adopting ERISA-estoppel as a cognizable theory.").

[84] *Id.* at 447 ("Mello's claim cannot surmount the clear and consistent case law forbidding recognizing reasonable reliance on informal documents in the face of unambiguous Plan terms.").

[85] *See Cell Sci. Sys. Corp.*, 804 F. App'x at 266.

[86] Doc. 443-9 at 616 (emphasis added); Defs.' App. at 26,110 (emphasis added).

[87] In addition, Plaintiffs' waiver argument fails because they have "presented no allegation, argument, or evidence demonstrating 'extraordinary circumstances'"—which is the fourth and final element of an ERISA-estoppel theory.  *Cell Sci. Sys. Corp.*, 804 F. App'x at 266 (holding that plaintiff's ERISA-estoppel theory fails at the summary-judgment stage).

DBW26, DBW27, DBW28, DBW29, DBW30, DBW31, DBW32, DBW3, DBW34, DBW35, DBW36, DBW37, DBW38, DBW39, DBW40, DBW41, DBW42, DBW43, DBW44, DBW45, DBW46, DBW47, DBW48, DBW49, DBW50, DBW52, DBW53, DBW54, DBW57, DBW58, DBW65, DBW72, DBW76, DBW77, DBW78, DBW79, DBW81, DBW82, DBW83, DBW84, DBW85, DBW86, DBW87, DBW88, DBW89, DBW90, DBW91, DBW92, DBW93, DBW94, DBW95, DBW96, DBW97, DBW98, DBW99, DBW100, PBW1, PBW2, PBW3, PBW4, PBW6, PBW12, PBW17, PBW18, PBW19, PBW20, PBW21, PBW22, PBW24, PBW25, PBW27, PBW28, PBW29, PBW30, PBW32, PBW33, PBW34, PBW37, PBW38, PBW39 PBW40, PBW41, PBW42, PBW43, PBW44, PBW45, PBW46, PBW47, PBW48, PBW49, PBW50, PBW65, PBW72, PBW76, PBW77, PBW78, PBW79, PBW81, PBW82, PBW83, PBW84, PBW86, PBW87, PBW88, PBW89, PBW90, PBW91, PBW92, PBW93, PBW94, PBW95, PBW96, PBW98, and PBW99.

### B. Exhaustion of Administrative Remedies for the ERISA-Governed Plans

The defendant argues that all ERISA-governed plans should be dismissed for the plaintiffs' failure to exhaust administrative remedies under the health benefit plans before filing suit.[88]  In response, the plaintiffs argue that they've satisfied the exhaustion requirement because they filed appeals for some bellwether claims to Blue Cross Blue Shield Texas.[89]   In the alternative, the plaintiffs argue that they're

---

[88] Doc. 424 at 33–36.

[89] Doc. 442 at 41–43.

excused from the exhaustion requirement because the futility exception applies.[90]  In reply, the defendants argue that the plaintiffs have not exhausted their administrative remedies because the home plans (and not Blue Cross Blue Shield Texas) is the proper body to which the plaintiffs should have filed appeals.[91]  The Court agrees with the defendants.

A claimant "denied benefits under an ERISA plan must exhaust all administrative remedies afforded by the plan before instituting litigation for recovery of benefits."[92]  By contrast, "informal attempts to substitute for the formal claims procedure" do not satisfy the exhaustion requirement because it "would frustrate the primary purposes of the exhaustion requirement."[93]  "Exceptions to the exhaustion requirement exist where the available administrative remedies either are unavailable or wholly inappropriate to the relief sought, or where the attempt to exhaust such remedies would be a patently futile course of action."[94]  For an exhaustion requirement to be futile, it "usually involv[es] a finding of bias or hostility on the part of the review board."[95]

---

[90] *Id.* at 42–43.

[91] Doc. 448 at 21–22.

[92] *Lacy v. Fulbright & Jaworski, Ltd. Liab. P'ship Long Term Disability Plan*, 405 F.3d 254, 256 (5th Cir. 2005).

[93] *Bourgeois v. Pension Plan for Emps. of Santa Fe Int'l Corps.*, 215 F.3d 475, 480 n.14 (5th Cir. 2000).

[94] *Gosselink v. Am. Tel. & Tel., Inc.*, No. 4:97-CV-3854, 1999 WL 33737443, at *2 (S.D. Tex. Aug. 9, 1999).

[95] *Gosselink*, 1999 WL 33737443, at *2 (collecting cases).

Here, as an initial matter, the plaintiffs have not produced evidence that they've exhausted their administrative remedies before filing suit. The health benefit plans at issue required the plaintiffs to file appeals regarding Rule of Three determinations to the home plan.[96] As an evidentiary point, the defendants have put evidence into the record that either: (1) the plaintiffs admit that they did not file a formal appeal with the proper body, (2) the plaintiffs admit that they cannot confirm or deny whether they filed a formal appeal to the proper body, and/or (3) that the defendants have no internal record of a formal appeal to the proper body.[97]

The plaintiffs did not rebut the defendants' evidentiary point. Instead, the plaintiffs argue that the appeals process was unclear[98] or that appeals filed to the wrong body constitute exhaustion.[99] While these points may or may not be true, the Fifth Circuit requires the plaintiffs "to offer proof of its compliance with the exhaustion requirement"[100] and "informal attempts to substitute for the formal claims procedure," such as filing appeals to the wrong body, do not satisfy the exhaustion requirement.[101]

Second, the plaintiffs' alternative argument that they need not satisfy the exhaustion requirement because an appeal would have been futile fares no better. To

---

[96] *See generally* Doc. 443-15; *see also id.* at 12.

[97] *See* Doc. 435-5 (table summarizing exhaustion of remedies).

[98] Doc. 442 at 39.

[99] *Id.* at 40.

[100] *Trinity Home Dialysis, Inc. v. WellMed Networks, Inc.*, No. 22-10414, 2023 WL 2573914, at *5 (5th Cir. Mar. 20, 2023) (per curiam).

[101] *Bourgeois*, 215 F.3d at 480 n.14.

prove futility, the plaintiffs must show "hostility or bias on the part of the administrative review committee."[102]  Similarly to the exhaustion requirement, the Fifth Circuit requires plaintiffs to offer evidence of hostility or bias.  Specifically, this evidentiary showing of hostility or bias must be *more* than statements made by a high-ranking company official stating that an administrative committee would reject a hypothetical appeal.[103]  And a showing of hostility must be *more* than claiming that an additional appeal to the same administrative body who rejected the first appeal triggers the futility exception to the exhaustion requirement.[104]

Here, the plaintiffs argue for the futility exception on pages 42 through 43 of their brief.[105]  In this section, the plaintiffs offer no evidentiary support suggesting that such an appeal would have been denied on the account of a hostility or bias.[106]  In other words, the plaintiffs have offered even less evidentiary support than the Fifth Circuit's *rejected* evidentiary showing of a statement from a high-ranking company employee.[107]  At best, in attempting to show hostility, the plaintiffs merely repeat their earlier argument that the appeals process was unclear.  The Fifth Circuit

---

[102] *McGowin v. ManPower Int'l, Inc.*, 363 F.3d 556, 559 (5th Cir. 2004).

[103] *See Bourgeois*, 215 F.3d at 480.

[104] *Denton v. First Nat'l Bank of Waco*, 765 F.2d 1295, 1300 (5th Cir. 1985).

[105] Doc. 442.

[106] *Id*. at 42–43.

[107] *Bourgeois*, 215 F.3d at 478, 480 (holding that "we cannot excuse" plaintiff's "failure to exhaust" under the futility exception because the informal "exchang[ing]" of "numerous letters" with the administrative body's chairman stating that plaintiff's claim "would receive no additional consideration" is not strong enough evidentiary support "that the actual Committee would not have considered his claim").

has rejected this argument repeatedly.[108]   In rejecting this argument, the Fifth Circuit expressly stated that plaintiffs arguing for forgiveness of the exhaustion requirement "are bound by the plan's administrative procedures and must use them before filing suit even if they have no notice of what those procedures are."[109]   Even further, the Fifth Circuit "imposes a duty [on the plaintiff] to seek the necessary information even if it has not been made available."[110]   So the plaintiffs' argument that the appeals process was unclear falls flat in this Circuit.[111]

In short, the Court dismisses nearly all bellwether claims because the plaintiffs have not met their initial evidentiary burden of providing "proof of [their] compliance with the exhaustion requirement."[112]   And in arguing futility, the plaintiffs have not made any evidentiary showing of hostility or bias.[113]

---

[108] *Meza v. Gen. Battery Corp.,* 908 F.2d 1262, 1279–80 (5th Cir. 1990); *see also Bourgeois*, 215 F.3d at 480; *Trinity Home Dialysis, Inc.*, 2023 WL 2573914, at *5; *Innova*, 2019 WL 13177034, at *5 (district court).

[109] *Bourgeois*, 215 F.3d at 480.

[110] *Id.* (rejecting the plaintiff's argument that his exhaustion should be excused due to incomplete plan information because Fifth Circuit case law "imposes a duty to seek necessary information even if it has not been made available").

[111] An oddity is that the plaintiffs themselves have produced evidence of the proper appeals process. *See generally* Doc. 443-15; *see also id.* at 12.   So the Court doubts the plaintiffs' contention that the appeals process was unclear to the plaintiffs—associations whose members are medical professionals—or that it was difficult to find.

[112] *Trinity Home Dialysis, Inc.*, 2023 WL 2573914, at *5; *Bourgeois*, 215 F.3d at 480; *Meza*, 908 F.2d at 1279 (rejecting the plaintiff's argument that exhaustion was not necessary because the defendants never provided him with a copy of the plan and instead holding that ERISA requires a plaintiff to use a plan's administrative procedures before filing suit even if the plaintiff does not know what those procedures are).

[113] One last point: Although the Fifth Circuit in *Bourgeois* held that the futility exception didn't apply, the Fifth Circuit ultimately excused the plaintiff's non-exhaustion using "equitable estoppel" principles. *Bourgeois*, 215 F.3d at 481; *see also Swanson v. Hearst Corp. Long Term Disability Plan*, 586 F.3d 1016, 1019 (5th Cir. 2009) (distinguishing *Bourgeois*); *Gonzalez v. Aztex Advantage,* 547 F. App'x 424, 428 (5th Cir. 2013) (same).   But the Court need not consider equitable estoppel because the plaintiffs have waived it, or worse, expressly disavowed its application to this case.   First, the plaintiffs waived *Bourgeois*'s "equitable estoppel" defense by failing to plead it or raise it in their summary

Accordingly, the Court dismisses the following ERISA bellwether claims for failure to exhaust administrative remedies: DBW1–21, DBW23–40, DBW42–44, DBW46–51, DBW53–58, DBW72–85, DBW87–91, DBW93–97, DBW99, PBW1–21, PBW23, PBW25, PBW27, PBW28, PBW30, PBW32–36, PBW39–53, PBW55–58, PBW65–66, PBW72–74, PBW76–84, PBW86, PBW88–90, PBW93–98, and PBW100.

## C. Exhaustion of Administrative Remedies for Non-ERISA Claims

---

judgment response. In the Fifth Circuit, "futility" and "equitable estoppel" are pled separately, and a failing to argue one results in waiver of the other. *See McGowin*, 363 F.3d at 559–60 (considering futility but not equitable estoppel). Here, most of the plaintiffs' briefing on exhaustion is devoted to an argument that the plaintiffs' submission to the wrong administrative body satisfies the exhaustion requirement. *See* Doc. 442 at 14–15. Moreover, the plaintiffs only argue futility (in the alternative) in their final exhaustion paragraph, and they fail to mention equitable estoppel or even cite to *Bourgeois*. *See id.* at 15.

But the plaintiffs go even farther than waiving equitable estoppel by affirmatively disavowing it in their sur-reply:

> [I]n connection with Plaintiffs' exhaustion of administrative remedies, *Plaintiffs do not need to establish ERISA estoppel* to demonstrate that Plaintiffs appealed the Bellwether claims. *See* Dkt. 448 at 11. Plaintiffs' arguments *do not depend on* whether Defendants made *material misrepresentations* to Plaintiffs (indeed, the Blue Card system *does not even allow Plaintiffs to communicate directly* with Defendants). Instead, the question for the Court is whether Plaintiffs have raised a genuine material fact the Plaintiffs exhausted their administrative remedies. The record evidence establishes that (1) Plaintiffs *appealed* the bellwether claims, (2) Plaintiffs were never provided with any meaningful reason for any of the underpayments for any of the Bellwether claims, (3) Plaintiffs were *never clearly and unambiguously instructed* where the appeals were supposed to be sent (but if anything they were told to submit to BCBSTX), and (4) appealing was *futile* because BCBSTX failed to respond to appeals and failed to provide plan documents. *See* Dkt. 442 at 30-35. *Plaintiffs are not required to establish ERISA estoppel to raise a genuine issue of material fact as to exhaustion.* And the fact of whether Plaintiffs have or have not established the elements of ERISA estoppel *is irrelevant*.

Doc. 449-1 at 7 (emphases added). Notably, material misrepresentations by a defendant is a key fact when determining whether *Bourgeois*'s "equitable estoppel" defense applies. *See Bourgeois*, 215 F.3d at 481–82 ("A promissory estoppel theory would recognize such a basis when, as in the current situation, *a claimant **relies to his detriment on the words and actions** of high-ranking company officers* who purport to negotiate benefit decisions without actual authority" (emphases added)).

The parties next dispute whether a small subset of bellwether claims not governed by ERISA[114] should be dismissed for failure to exhaust.[115] The defendants argue that the non-ERISA bellwether claims include contractual provisions requiring exhaustion of administrative appeals before bringing a claim in court.[116] The plaintiffs' response is two-fold. First, the plaintiffs argue that exhaustion is first a factual question unresolvable at the summary-judgment stage.[117] Second, the plaintiffs state that the defendants have failed to identify any non-ERISA plans requiring exhaustion. The Court agrees with the defendants.[118]

The parties have identified only a single case discussing the exact topic of a non-ERISA-governed health benefit plan contractually requiring exhaustion before suit in a federal or state court.[119] Nevertheless, at base, this issue is one of contract

---

[114] Those claims are: DBW22, DBW41, DBW45, DBW52, DBW65, DBW66, DBW71, DBW86, DBW92, DBW98, DBW100, PBW22, PBW24, PBW37, PBW38, PBW54, PBW75, PBW85, PBW87, PBW91, PBW92, and PBW99.

[115] The exhaustion analysis as to the bellwether claims not governed by ERISA is somewhat unnecessary. Many of these claims have been dismissed for lacking subject-matter jurisdiction. For example, one of the non-ERISA claims the defendants argue should be dismissed for failure to exhaust administrative remedies is PBW24. *See* Defs.' App. at 31,346; *id.* at 31,335. Regardless of the exhaustion analysis, PBW24 lacks subject-matter jurisdiction because the PBW24's health benefit plan assigns the right to pursue legal relief to "Christus Spohn Hospital—Kleberg Hospital." *Id.* at 252–53. Christus Hospital is not a plaintiff in this litigation. And even if PBW24's health benefit plan included catch-all language assigning the right to pursue legal relief to "Hospital physicians" (it doesn't), the plaintiffs' brief does not point this Court in the direction of where it can find evidence in the record of what members of the plaintiffs' associations worked in the hospital at the time one of the 182 patients received health care services. Nevertheless, despite PBW24's subject-matter deficiency, the Court includes the exhaustion analysis so the Fifth Circuit has the benefit of knowing the Court's belief as to all legally fatal deficiencies in each claim.

[116] Doc. 424 at 36–37.

[117] Doc. 442 at 43.

[118] *Id.*

[119] *Nunn v. City of Vernon*, No. 07-02-0486-CV, 2003 WL 22240577, at *2 (Tex. App.—Amarillo Sept. 30, 2003, no pet.) (mem. op.) (enforcing health plan's contractual provision requiring administrative exhaustion before filing suit).

interpretation, so the Court must apply traditional, cookie-cutter principles of contract interpretation.

In Texas,[120] when interpreting a contract, "courts must determine the parties' intent as reflected in the terms of the policy itself."[121] To do this, courts "examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless."[122] More specifically, "no one phrase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions."[123] "Unless the [contract] dictates otherwise, [courts] give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage."[124]

Here, the language used in all but two of the non-ERISA governed plans requires exhaustion before bringing suit. For instance, DBW100 states that "You shall not start legal action against us until You have exhausted the appeal procedure described in this section."[125] And PBW38 mandates that "You have the right to bring suit . . . in state or federal court (as appropriate) only after You have exhausted the

---

[120] Neither side argue what state law applies for this issue. Both sides concede on the subsequent topic of limitations that Texas law applies. So the Court applies Texas law to this issue too. The Court is mindful of the fact that choice of law only becomes an issue when competing laws diverge, and the Court is unaware of any state law that encourages judges to rewrite contracts.

[121] *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257–58 (Tex. 2017) (cleaned up).

[122] *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010).

[123] *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994) (alteration in original).

[124] *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015) (second alteration in original).

[125] Doc. 443-9 at 773; Defs.' App. at 26,227.

Appeal of an Adverse Decision."[126] DBW100's and PBW38's language expressly sets a condition precedent (exhaustion of remedies) before filing suit.

After reviewing the record, the Court dismisses the following non-ERISA bellwether claims for failure to exhaust administrative remedies: DBW22,[127] DBW41,[128] DBW65,[129] DBW92,[130] DBW98,[131] DBW100,[132] PBW24,[133] PBW38,[134]

---

[126] Doc. 427-2 at 60; Defs.' App. at 7,421.

[127] "You may not sue until you have completed the disputed claims process." Def.'s App. at 3,931.

[128] "The Member may not bring a lawsuit to recover Benefits under this Benefit Plan until the Member has exhausted the administrative process described in the section entitled Individual Benefit Determination and Appeal Procedure." *Id.* at 12,903.

[129] *Id.* at 29,112 ("This Procedure is the exclusive method of resolving any Dispute."); *id.* at 29,112–14 (describing review procedure).

[130] "No Court suit shall be brought to recover on this Policy before sixty (60) days after a claim has been submitted in accordance with the terms of this Policy." *Id.* at 21,246.

[131] "You should not start legal action against us until you have exhausted the appeal procedure described in this section." *Id.* at 25,994.

[132] "You should not start legal action against us until you have exhausted the appeal procedure described in this section." *Id.* at 26,227.

[133] "You may not take legal action against us to receive benefits earlier than 60 days after we receive the claim." *Id.* at 7,276.

[134] "You have the right to bring suit (including under ERISA Section 502(a) if applicable) in state or federal court (as appropriate) only after You have exhausted the Appeal of an Adverse Decision, whether or not You pursue External Review." *Id.* at 7,421.

PBW85,[135] PBW87,[136] PBW91,[137] PBW92,[138] and PBW99.[139]  As explained below, two claims run through the gauntlet of the above arguments for summary judgment.

### D. Timeliness

After reviewing the record, only two bellwether claims survive at this point: DBW71 and PBW54.  As to DBW71, the defendants raise limitations and payment.[140]  As to PBW54, the defendants raise exhaustion of administrative remedies,[141] limitations, and other contractual limitations.  Because both claims are untimely, the Court only reaches the limitations arguments.

The defendants argue that, because Texas law imposes a four-year statute of limitations, any bellwether claim accrued on or before February 19, 2015, which is four years before the date of the plaintiffs' *amended* complaint, is time-barred.[142]  In response, while the plaintiffs agree that Texas law imposes a four-year statute of limitations, the plaintiffs argue that any bellwether claim accrued on or before

---

[135] *See id.* at 16,183–86 (describing a "Level 5 Appeal" made to a "Federal District Court" as the last step to occur, which occurs only if you exhaust the previous stages).

[136] "No Court suit shall be brought to recover on this Policy before sixty (60) days after a claim has been submitted in accordance with the terms of this Policy." *Id.* at 18,960.

[137] "No Court suit shall be brought to recover on this Policy before sixty (60) days after a claim has been submitted in accordance with the terms of this Policy." *Id.* at 19,487.

[138] "No Court suit shall be brought to recover on this Policy before sixty (60) days after a claim has been submitted in accordance with the terms of this Policy." *Id.* at 19,606.

[139] "You shall not start legal action against us prior to the expiration of 60 days after receiving written notice of an adverse determination." *Id.* at 25,727.

[140] Doc. 435-2 at 6.

[141] Unlike the mandatory appeals requirements of the plans in the others claims in Section III.C, *supra*, that the Court held were mandatory, PBW54's text states that the appeals process "must be exhausted as required by ERISA." Defs.' App. at 29,707.  PBW54 is a non-ERISA claim, so it is governed by contract. *Id.* at 31,347.  ERISA doesn't require appeals of non-ERISA claims.  So there is no contractual requirement to appeal PBW54 before filing suit.

[142] Doc. 424 at 51–54.

February 19, 2014, which is four years before the date of the plaintiffs' *original* complaint, is time-barred.[143]  Regardless of which complaint date applies, the statute of limitations ran on DBW71's and PBW54's claim before the plaintiffs filed their original complaint.

"ERISA does not provide a statute of limitations for suits to recover benefits."[144]  Instead, "[t]he limitations period for analogous claims under state law may fill the gap."[145]  "In Texas, the most analogous state statute of limitations is the four[-]year limitation governing suits on contracts."[146]  "Alternatively, the parties may fill the gap by agreement."[147] And as for when the clock starts, "[u]nder ERISA, a cause of action accrues after a claim for benefits has been made and formally denied."[148]

Here, DBW71[149] is a payment receipt relating to health care services performed at Houston Methodist Hospital.[150]  The total for these services was $773.00, yet the receipt indicates $114.91 was charged.[151]  In any event, receipt of this alleged underpayment occurred on August 22, 2013.[152]  This is the accrual date

---

[143] Doc. 442 at 54–56.

[144] *Faciane v. Sun Life Assurance Co. of Canada*, 931 F.3d 412, 417 (5th Cir. 2019).

[145] *Id.*

[146] *Dye v. Assocs. First Cap. Corp. Long-Term Disability Plan 504*, 243 F. App'x 808, 809 (5th Cir. 2007) (citing TEX. CIV. PRAC. & REM. CODE § 16.004(a)).

[147] *Faciane*, 931 F.3d at 417.

[148] *Harris Methodist*, 426 F.3d at 337.

[149] *See* Doc. 431-7 at 42–45; Defs.' App. at 11,605–09.

[150] Doc. 431-7 at 43–46; Defs' App. at 11,606–69.

[151] *Id.* at 45, 11,608.

[152] *Id.* at 46, 11,609.

of the claim, as there is no record of appeal.[153]  This predates the date of the plaintiffs'

original complaint: February 20, 2018.[154]

Likewise, PBW54[155] is a payment remittance for healthcare services dated

January 31, 2014.[156]  There is no record of appeal for this claim, so the Court takes

this date as the accrual date.  Applying Texas's four-year statute of limitations,

DBW71's claim became time-barred on August 22, 2017.  And PBW54's claim became

time-barred on January 31, 2018.  This also predates the date of the plaintiffs'

original complaint: February 20, 2018.[157]

Therefore, the Court dismisses the two remaining claims, DBW71 and PBW54,

as time-barred.

## IV. Conclusion

Accordingly, the Court **GRANTS** the defendants' Motion for Partial Summary

Judgment as to the bellwether claims, (Doc. 423).  The Court **DISMISSES**

**WITHOUT PREJUDICE** all bellwether claims but DBW71 and PBW54.  Those

claims had issues such as exhaustion of administrative remedies and assignment

problems that deprive the Court of jurisdiction, so the Court lacks power to reach the

merits, and dismissal without prejudice is appropriate.  The Court has jurisdiction

over DBW71 and PBW54, but those claims are barred by limitations, which is a

---

[153] Plaintiffs have not provided evidence as to a different accrual date—that is, Plaintiffs have not provided record of an appeal for these services.  So the Court will use the date of the payment receipt as the accrual date.

[154] *See* Doc. 1.

[155] *See* Doc. 425-3 at 262–63; Defs.' App. at 536–37.

[156] Doc. 425-3 at 263; Defs.' App. at 537.

[157] *See* Doc. 1.

merits issue.  As such, the Court **DISMISSES WITH PREJUDICE** DBW71 and PBW54.  Additionally, the Court **FINDS AS MOOT** the Motions to Strike or Exclude Expert Testimony, (Docs. 417, 419).

      **IT IS SO ORDERED** this 9 day of January, 2024.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE